**Affirmed and Opinion filed May 7, 2013.**



In The

# Fourteenth Court of Appeals

## NO. 14-11-01015-CR

### TIMOTHY GARRETT LINNEY, Appellant,

### V.

### THE STATE OF TEXAS, Appellee.

**On Appeal from the 179th District Court**
**Harris County**
**Trial Court Cause No. 1312489**

## O P I N I O N

A jury convicted appellant Timothy Garrett Linney of indecency with a child and assessed his punishment at eight years' confinement in the Texas Department of Criminal Justice, Institutional Division, probated for eight years. In five issues, Linney appeals. We affirm.

# I

Linney, the appellant, is complainant Jane's[1] paternal uncle. Throughout her young life, Jane and her sister, Kelly, lived with their parents, Jim and Cindy. Linney lived nearby with his wife, Valerie, and their young son, Steve. Jim and Linney's parents (Jane's grandparents), David and Donna, also lived nearby. Jane had good relationships with her extended family members and saw them relatively often.

In 2005, Jane began cutting herself to cope with stress and low self-esteem that resulted from being bullied at school. When her parents discovered Jane's self-destructive behavior, they took her to a counselor named Mary Maurer, who treated Jane for about a year. During that time, Maurer helped Jane improve her coping skills. By the time Jane stopped seeing Maurer in 2006, Jane had stopped cutting herself, and she was no longer being bullied at school.

During the summer of 2008, Jane and her family frequently went to David and Donna's house to swim and spend time together. On June 21, when Jane was fourteen years old, she went to Linney's house to babysit Steve. Because Linney and Valerie knew they were going to be out late, they planned for Jane to spend the night at their house, and she was already asleep when they got home.

When Linney awoke early the next morning, he got out of bed and, wearing only his boxers, went to the guest bedroom to see if Jane was awake. According to Jane, Linney got into bed with her and pressed himself up against her from behind, and she could feel his penis. At trial, Linney denied getting into the bed and insisted he remained at the bedroom door. After they talked for a few minutes, Linney went into the living room. When Jane got up shortly thereafter, Linney

---

[1] We have used a pseudonym for the complainant to protect her privacy. We have also used pseudonyms for all of the complainant's relatives, except for the appellant himself.

asked her if she wanted to watch a movie, and she agreed. Valerie got up to check on Steve and, seeing Linney in his boxers, suggested he put shorts on. Linney complied, and Valerie got back in bed. When Linney returned to the living room, Jane was lying on the couch. Linney removed the cushions from the back of the couch and lay down behind her.

Linney and Jane have diametrically different accounts of what happened next. According to Jane, she and Linney were both lying on their sides underneath a blanket, and, once again, Linney pressed himself up against her from behind and she could feel his erect penis on her lower back. Linney placed one hand on her breast over her shirt and his other hand on her thigh. He gradually moved his hand up her thigh and underneath her shorts and underwear until he was touching her vagina. Jane testified she felt confused, and she was too embarrassed to say anything or try to leave because she did not want to acknowledge what was happening. At trial, Linney testified Jane was lying on her back and he was lying next to her on his side with his hands over the blanket. He denied touching her at all and specifically denied touching her breast or vagina.

Jane and Linney agree that at some point during the movie, Steve woke up, came into the living room, and got between them on the couch. After a few minutes, Linney got up to change Steve's diaper, and Jane went into the bathroom until she heard Valerie get up. After Jane came out, Valerie and Steve left to pick up doughnuts. Jane stayed at the house with Linney. She phoned her father to ask how she was going to return home, and he said Valerie or Linney would take her. After breakfast, Linney drove Jane home.

In mid-August, Valerie called Jane and asked her to babysit Steve again a few days later. Because Valerie needed Jane early in the morning, she suggested Jane sleep over the night before. Although Jane agreed, Cindy thought she seemed

3

stressed and reluctant to sleep at Valerie and Linney's house, so she offered to drive Jane to babysit in the morning. Cindy thought Jane seemed "too relieved" about the offer, so she asked whether anything was wrong. Jane initially said no, but Cindy sensed otherwise. After she encouraged Jane to be honest, Jane reluctantly explained how Linney touched her after she babysat Steve in June. Jane and Cindy immediately told Jim.

The next day, Cindy made an emergency appointment to see Maurer. Cindy told Maurer about Jane's disclosure, and Maurer, pursuant to her legal duty, immediately reported it to Children's Protective Services. On August 28, Jane was taken to the Children's Assessment Center (CAC) for a forensic interview. Jane described the alleged offense. She also explained that on several previous occasions when she was playing keep-away with Linney in David and Donna's pool, he had held her from behind, pressed his body against hers, and she had felt his erect penis against her back. Jane was then given a physical examination by Dr. Farja Pereira, during which she answered questions about her medical history and emotional symptoms. Linney was required to report to the CAC for an interview the following week, which is when he first learned of Jane's accusation.[2] Jane's extended family has not spoken to her or her immediate family since that time.

Linney was indicted for two counts of indecency with a child—one for touching Jane's vagina, and one for touching her breast through her clothing—and he pleaded not guilty to both. A jury found him not guilty of the first count and guilty of the second. On appeal, Linney argues: (1) the trial court unconstitutionally limited his right to cross-examine witnesses; (2) the trial court

---

[2] During his interview, Linney was asked whether he touched Jane on the morning of June 22, 2008, and he said either "I hug her" or "I hugged her," "because she is my niece, but other than that, no sort of contact." When asked about the discrepancy between this response and his testimony at trial, Linney explained that he was in a state of shock during the interview, and he answered the questions to the best of his ability.

4

unconstitutionally denied his right to put on a defense at trial; (3) the trial court erred by admitting into evidence purported "outcry" testimony from Cindy; (4) the trial court erred by overruling Linney's objection to inadmissible hearsay testimony of Kelly; and (5) reversible error is presented by the cumulative effect of those errors. Because Linney's first and second points of error arise from the same facts, we consider them together.

## II

During its case in chief, the State introduced evidence that in September of 2008, Jane began experiencing increased anxiety and having nightmares. Shortly thereafter, Maurer diagnosed her with post-traumatic stress disorder (PTSD). In the months that followed, Jane's peer relationships deteriorated, and she began drinking, using drugs, and sneaking out of the house. As her deviant behavior gradually worsened, she began cutting herself again, experiencing suicidal ideations, and sexually acting out. The State concluded its case in chief with the expert testimony of Dr. Lawrence Thompson, a clinical psychologist who specializes in child victims of sexual abuse. Dr. Thompson testified that sexual acting out and heightened levels of anxieties and interpersonal difficulties are characteristics commonly seen in children who have been sexually abused. Through this evidence, the State invited the jury to infer from those behaviors that the offense in fact occurred.

Linney sought to challenge that inference with evidence of an extraneous traumatic event—Jane being rejected by the boy to whom she lost her virginity—which Linney argued was the actual reason Jane began cutting herself again. Linney attempted to elicit testimony about the extraneous event from Cindy, Jim, Jane, and Maurer, but the State consistently objected to the line of questioning. The trial judge limited the testimonies of each witness to different extents. On appeal,

5

Linney argues the trial court's limitations violated his constitutional rights to cross-examine the State's witnesses and to present a meaningful defense.

A

Criminal defendants have a constitutionally protected right to cross-examine witnesses. U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986); *Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). The scope of appropriate cross-examination is necessarily broad: "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility." Tex. R. Evid. 611(b); *Caron v. State*, 162 S.W.3d 614, 617 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Nevertheless, the trial courts retain wide latitude to impose reasonable limits on cross-examination. *Van Arsdall*, 475 U.S. at 679. The trial court must carefully consider the probative value of the evidence and weigh it against the risks of admission. *Hodge v. State*, 631 S.W.2d 754, 758 (Tex. Crim. App. [Panel Op.] 1982). These potential risks include "the possibility of undue prejudice, embarrassment or harassment to either a witness or a party, the possibility of misleading or confusing a jury, and the possibility of undue delay or waste of time." *Id.*; *see also Chambers v. State*, 866 S.W.2d 9, 27 (Tex. Crim. App. 1993); *Castillo v. State*, 939 S.W.2d 754, 758 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

Additionally, whether rooted in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)); *Holmes v. State*, 323 S.W.3d 163, 173 (Tex. Crim. App. 2009). The exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a

6

vital portion of the case that exclusion effectively precludes him from presenting a defense. *Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002).

The Constitution does not relieve a defendant from the obligation to comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see Hammer v. State*, 296 S.W.3d 555, 566 (Tex. Crim. App. 2009) ("Only if the proffered evidence is barred by all state evidentiary rules must courts turn to the federal constitution."). Nevertheless, cases involving indecency with a child are often "he said, she said" trials in which "the jury must reach a unanimous verdict based solely upon two diametrically different versions of an event, unaided by any physical, scientific, or other corroborative evidence." *Hammer*, 296 S.W.3d at 561–62. Because the credibility of both the complainant and the defendant is a central, often dispositive issue in these "he said, she said" trials, the rules of evidence should be used sparingly to exclude relevant, otherwise admissible evidence that might bear upon the credibility of either party. *Id.* We review the trial court's decision to bar the admission of evidence for an abuse of discretion. *Miller v. State*, 36 S.W.3d 503, 507 (Tex. Crim. App. 2001); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).

To preserve error, including a constitutional error, for appellate review, the appellant must make a timely, specific objection to the trial court and obtain a ruling on the objection. Tex. R. App. P. 33.1; *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991); *see Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) (holding errors based on the constitutional rights to confrontation and due process may be waived by failure to object at trial). The point of error on appeal must correspond to the objection made at trial. *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *see Johnson v. State*, 803 S.W.2d 272, 292 (Tex.

Crim. App. 1990) ("An objection stating one legal theory may not be used to support a different legal theory on appeal."), *overruled on other grounds by Heiman v. State*, 815 S.W.2d 681 (Tex. Crim. App. 1991). Further, error may not be predicated upon a ruling that excludes evidence unless the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Tex. R. Evid. 103(a)(2). It is the appellant's burden to make a record, through a bill of exceptions, of the evidence he desires admitted. *Montgomery v. State*, 383 S.W.3d 722, 726 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "The primary purpose of an offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful." *Mays v. State*, 285 S.W.3d 884, 890 (Tex. Crim. App. 2009) (quotation omitted).

1

Cindy was the State's first witness. On cross-examination, defense counsel asked, "[T]he reason that [Jane] cut herself, isn't it true, is because - - and she told you this - - that she had lost her virginity to a boyfriend and was upset because the boyfriend then spent the weekend with his ex-girlfriend?" The State objected, arguing the question was argumentative, speculative, and improper impeachment. Linney insisted Cindy's testimony had created the impression that the alleged offense was the only cause of Jane's behavior. He incorrectly alleged that during direct examination, Cindy testified there was no other reason for Jane's cutting, and therefore, Linney argued, the proffered testimony was admissible to correct that false impression. The trial judge assured Linney he would have the chance to cross-examine other witnesses, and Linney objected "to not being able to cross this one, leaving the wrong impression with the jurors." The prosecutor emphasized, "[Cindy] never said that on direct that the only reason [Jane] is the way she is is because of what [Linney] did."

8

Linney's argument was insufficient to preserve a constitutional error. The right to introduce collateral evidence during cross-examination to correct the false impression created by a witness's testimony is distinct from the constitutional right to cross-examine witnesses. *See, e.g.*, *Holland v. State*, 802 S.W.2d 696, 700 (Tex. Crim. App. 1991) (concluding a hearsay objection did not preserve a constitutional error because evidentiary and constitutional errors "are neither synonymous nor necessarily coextensive"). Therefore, to the extent Linney's first and second issues relate to Cindy, he failed to preserve the issues. *See id.*[3]

2

Linney tried to introduce similar testimony through Jim, asking, "One year later when these behaviors started to appear, your daughter had told you that she had been disappointed by the boy that had - - that she had made love to for the first time, lost her virginity to?" The State objected, arguing it was irrelevant and improper. In response, Linney asserted, "I'm entitled and I believe the case is *United States v. Wade* to present a defense. Every defendant has a right, [a] constitutional right, to put on a defense."[4] He did not, however, assert the constitutional right to cross-examine witnesses. Accordingly, Linney failed to preserve his first issue to the extent it relates to Jim. *See Acevedo v. State*, 255 S.W.3d 162, 173 (Tex. App.—San Antonio 2008, pet. ref'd) ("To preserve denial

---

[3] Although Linney does not restate his trial argument on appeal, we note that the trial court did not abuse its discretion by sustaining the State's objection. The rule allowing collateral evidence to correct a false impression does not apply in this case because any false impression left with the jury was created by Linney's cross-examination of Cindy. *See Shipman v. State*, 604 S.W.2d 182, 184–85 (Tex. Crim. App. 1980) (explaining that a party who creates a false impression through his cross-examination of a witness cannot rely on his own questioning to introduce evidence of collateral matters).

[4] The issue in *United States v. Wade* was a criminal defendant's constitutional right to assistance of counsel. 388 U.S. 218 (1967). In its analysis, the Court explained, "The plain wording of this guarantee thus encompasses counsel's assistance whenever necessary to assure a meaningful 'defence.'" *Id.* at 225.

of a right to confrontation error, one must specifically object based on the Confrontation Clause.") (citing *Holland*, 802 S.W.2d at 700).

Linney did object based on his constitutional right to present a defense. We need not decide Linney's constitutional issue, however, because he failed to obtain an adverse ruling on his objection. In response to Linney's objection, the trial judge ruled the testimony was premature and advised Linney that he could recall Jim after Jane testified about the substance of the statements.[5] Linney never moved to recall Jim, however, and thus failed to obtain an adverse ruling. Therefore, Linney failed to preserve any error with respect to Jim's testimony.

Even if Linney had preserved error, and assuming without deciding that the evidence was admissible, Jim's testimony about an extraneous event that may have contributed to the reason Jane cut herself was not so vital to Linney's defense that its exclusion effectively precluded Linney from presenting a defense. Linney's primary defense was that Jane is a liar, which he proved through his own testimony as well as testimony from Donna, David, and Valerie, all of whom said that Jane was not a truthful person. Those witnesses also contradicted Jane's allegations that Linney inappropriately touched her in the pool, and Linney and Valerie both challenged Jane's account of the charged offense. To the extent Linney's defense involved showing an extraneous event that may have caused Jane's post-offense behavior, there was substantial evidence of other stressors in Jane's life at the time. Most notably, it is undisputed that Jane lost her relationships with her extended family members as a result of her allegation, and this loss was emotionally difficult

---

[5] The trial judge specifically said, "We talked about it yesterday after - - you will have your opportunity. You can recall the witness at that time, but it seems a little premature." The conversation the judge referred to from the previous day took place after Cindy testified, when Linney again asked permission to elicit the excluded testimony from Cindy. The State argued Jane needed to testify first. The trial judge impliedly agreed, assuring Linney he could recall Cindy.

for her. That extraneous event is particularly relevant because, unlike the rejection, the loss of her family occurred before all of Jane's post-offense aberrant behavior. "That [the defendant] was unable to . . . present his case to the extent and in the form he desired is not prejudicial where, as here, he was not prevented from presenting the substance of his defense to the jury." *Potier*, 68 S.W.3d at 666 (quoting *United States v. Willie*, 941 F.2d 1384, 1398–99 (10th Cir. 1991)) (internal quotation marks omitted).

3

We move now to Jane's testimony. During cross-examination, Jane said she began cutting herself again while she was in the tenth grade to relieve stress from her family not talking to her. When asked if that was the only cause of her stress, she said no. Defense counsel then asked, "Was [sic] there any other events that were occurring in your life that caused you stress that caused you to start cutting?" The State objected to this line of questioning as "specific instances of conduct." The State continued: "No representation has been made by the State that [Jane] started cutting solely because of what this defendant did in reference to this entire line of questioning." In a six-minute response, defense counsel contended Linney's right to present a defense required the evidence because the State implied Jane's behavior was "all because of Linney." Linney would not get a fair trial, counsel argued, unless he was permitted to prove "all that behavior that has been described is due to . . . entirely something else because [Linney] can't be responsible because he is innocent." The judge ruled, "Under 401, 402 and 403, I'm not going to allow it in. That is why we have the law. You don't get to go into her sexual history unless it's been made relevant. . . . I don't find it relevant."

Defense counsel asked permission to cross-examine Jane outside the jury's presence, stating for the record, "[I]f I were permitted to ask her the question: Why

11

did you start cutting again, I proffer her answer would be: Because my boyfriend rejected me after he took my virginity. And I would eliminate the possibility that this jury could taint him, Tim Linney, with that cutting." He further explained that he wanted to ask Jane how she felt about losing her virginity, her ex-boyfriend, cutting herself, and about the coincidental timing of those events. The trial judge initially ruled, "I'm not going to let you go into any explicit sexual narrative or questioning of this lady . . . I will let you ask if it is causative of her depression or whatever it was." But the State again objected, citing rule 403 and arguing, "the reason the law protects victims in this kind of situation is that it is very personal. . . . we've established from the beginning that there is [sic] various reasons why she's had this self-destructive behavior." Ultimately, the trial court sustained the State's objection, precluding Linney from questioning Jane outside the jury's presence but assuring him, "you have made your bill of exception and it will be preserved for appellate purposes."

i

Because the trial court limited Linney's cross-examination of Jane, we must determine whether that limit was reasonable by weighing the probative value of the evidence against the risks of admission. *See Hodge*, 631 S.W.2d at 758. Here, the probative value of the excluded evidence was moderate. First, even if the excluded extraneous offense contributed to the reason Jane began cutting herself again, that would not impeach Jane's credibility because she neither attributed her cutting to a single event nor denied that the offense was a contributing factor. Second, although Linney insists the boyfriend's rejection of Jane was highly probative because it was the only specific extraneous event he could point to as a potential alternative cause for Jane's post-offense behavior, we disagree. The loss of Jane's extended family, which was the primary cause she identified when asked why she began

12

cutting herself again, was also a specific extraneous event, although a long-term one. And as discussed above, the loss of Jane's extended family preceded all of her post-offense behavior, whereas the boyfriend's rejection did not occur until months later. The probative value of the excluded evidence is also weakened by Jane's testimony that she began cutting herself "[s]ometime in tenth grade," which she completed in the spring of 2009, because the boyfriend's rejection did not occur until the fall of that year. This timing disparity was potentially explained, however, by the fact that Jane also emphasized that she was honest with Maurer, she did not tell Maurer she had resumed her cutting habit until the fall of 2009, and Jane admitted she was unsure about when some of her other post-offense symptoms began to manifest. Further, it is undisputed that although Jane's aberrant behavior began at the beginning of 2009, it did not escalate to the point of her being "out of control" until her junior year.

Although the probative value of the excluded evidence was only moderate, we conclude that it outweighed the minimal risks of admission. Because the rejection neither involved dishonesty on Jane's part nor contradicted her testimony, it is unlikely that the jury would have been improperly influenced to doubt Jane's credibility based on that evidence. To the extent the evidence may have influenced the jury to conclude the boyfriend's rejection, rather than the offense, was the actual cause of Jane's post-offense cutting, that influence would not have been improper. Additionally, the risk of embarrassment or harassment to Jane was minimal because there is no suggestion in the record that the line of questioning would have involved any details about her sexual behavior other than when and to whom she lost her virginity. Further, the risks of misleading or confusing the jury and of undue delay or waste of time were negligible given that the State had already elicited substantial testimony from numerous witnesses about Jane's

13

symptoms and behaviors after the offense, as well as the extraneous stressors in her life during that time. Therefore, having balanced the probative value of the excluded evidence against the risks of admission, we conclude the trial court's limitation of Jane's cross-examination constituted an abuse of discretion.

ii

Because the trial court excluded evidence in violation of the Confrontation Clause, we must conduct a three-prong harmless-error analysis to determine whether the error warrants reversal of the conviction. *See Van Arsdall*, 475 U.S. at 684; *Shelby v. State*, 819 S.W.2d 544, 547 (Tex. Crim. App. 1991). First, we assume the damaging potential of the cross-examination was fully realized. *Van Arsdall*, 475 U.S. at 684; *Shelby*, 819 S.W.2d at 547. Second, we review the error in connection with the following factors: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case. *Van Arsdall*, 475 U.S. at 684; *Shelby*, 819 S.W.2d at 547. Finally, we determine whether the error was harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 684; *Shelby*, 819 S.W.2d at 547.

First, we begin with the assumption that if Linney had been permitted to ask Jane about the rejection, she would have both acknowledged the event and identified it as a contributing factor to her subsequent cutting.

Second, we review the error in connection with the five factors from *Van Arsdall*. Because Jane and Linney were the only two witnesses with any direct knowledge of the alleged offense, Jane was the most important witness to the

14

prosecution's case, although that is not to say her testimony about her post-offense cutting was equally as critical as her testimony about the offense itself. The excluded evidence was cumulative to the extent it was merely an additional extraneous stressful event that contributed to Jane's behavior, but not to the extent it was specifically offered to explain the revival of Jane's cutting habit. Additionally, had Jane testified about the rejection, the jury likely would have heard Maurer's corroborating testimony (discussed further below) that she believed the rejection was related to Jane's subsequent cutting and that it could have been the only cause of that behavior, although Maurer also explained that she could not attribute Jane's symptoms and behaviors to any single event with any degree of certainty.[6] Further, the extent of cross-examination otherwise permitted was broad: Linney was not precluded from asking Jane about the other stressors in her life during the relevant time period or from impeaching her credibility, which we discuss in greater detail below. Finally, the overall strength of the untainted evidence of guilt was modest. The jury ultimately had to weigh Jane's credibility against Linney's, and the fact that they found Linney guilty of one count but not guilty of the other shows that the jury did not fully credit either party. The State's case was strengthened by the fact that the jury had no indication of what could have motivated Jane to fabricate this accusation against her uncle, with whom she had previously enjoyed a good, friend-like relationship. Although it was not Linney's burden to provide a motive, the absence of one certainly strengthened the State's position given that the outcome of the case necessarily turned on the parties' credibility.

---

[6] Because Dr. Thompson did not mention cutting at all, his testimony would not have corroborated or contradicted Jane's with respect to the excluded testimony.

15

In light of those considerations, we conclude the trial court's error was harmless beyond a reasonable doubt. Even if the jury concluded the boyfriend's rejection caused Jane to cut herself, it would not have impeached her credibility, suggested why she may have fabricated the offense, or provided an alternative explanation for her pre-rejection symptoms or behaviors. Therefore, the evidence neither exacerbated the weaknesses in the State's case nor mitigated the weaknesses in Linney's. Accordingly, the trial court's limitation of Jane's cross-examination did not rise to the level of constitutional error.

Having come to that conclusion, we further conclude that the excluded evidence did not form such a vital portion of the case that its exclusion effectively precluded Linney from presenting a defense. *See Potier*, 68 S.W.3d at 665. Therefore, the trial court's evidentiary error did not violate Linney's constitutional right to present a defense, and we overrule Linney's first two issues to the extent they relate to Jane.

4

When the State called Maurer, the trial court held a Rule 702 hearing outside the jury's presence. Before Maurer took the stand in the hearing, the trial judge cautioned both the prosecution and the defense "not to elicit from this witness anything about sexual activity of [Jane]." Linney again objected to this limitation.

During the hearing, Maurer testified that she began seeing Jane on a regular basis on August 26, 2008, and she diagnosed Jane with PTSD within the first two months of treatment. When asked if she could determine with any degree of certainty the cause of Jane's cutting, Maurer explained "[p]oor coping skills is the cause of that, acting out in that way, not being able to cope with her stress, anxiety, depression in ways that are more functional." Maurer could not trace all of Jane's

16

stress and anxiety back to one event, but she opined that the offense put in motion a number of other reactions that were devastating to Jane, and the culmination of everything that happened as a result of the offense caused Jane to cut herself. Maurer specifically testified that Jane's problems at home and at school, specifically with boys and her peers, contributed to the reason Jane cut herself.

On cross-examination, still during the Rule 702 hearing, the following exchange occurred:

> Q: All right. This cutting event that was now first reported on 9/9/09 was in the same session that [Jane] revealed that she had been rejected by her boyfriend after losing her virginity, true?
>
> A: Yes.
>
> Q: Were those two, in your opinion, related?
>
> A: Yes.
>
> Q: And could the cutting have been due exclusively to the rejection by the boyfriend who had taken her virginity?
>
> A: It could have.

Defense counsel told the judge he believed he was entitled to repeat the question in the jury's presence, but the judge disagreed. After the hearing, the judge instructed Maurer, "You are not to discuss or elicit your own testimony about [Jane] losing her virginity or anything like that, if that's so. I don't know anything about it. I don't have any evidence before us at this time, but you are not to discuss it."[7]

We note that had Linney be permitted to question Jane about the extraneous event, we presume there would have been evidence before the trial court about Jane losing her virginity. But assuming, without deciding, that the trial court erred by limiting Maurer's cross-examination, we conclude that Linney has not shown reversible error. Similar to our analysis above, we start with the presumption that

---

[7] Linney did not make a Rule 702 objection after the hearing.

Maurer would have testified that the boyfriend's rejection caused Jane to cut herself. And again, that testimony would not have impeached Maurer's or Jane's credibility, it would not have suggested why Jane may have fabricated the offense, and it would not have provided an alternative explanation for Jane's pre-rejection symptoms or behaviors. Accordingly, we conclude that even if the trial court's ruling was erroneous, it was harmless beyond a reasonable doubt, and it did not violate Linney's constitutional rights to cross-examine witnesses or to present a defense.

5

Finally, during Linney's case in chief, he asked the trial court to reverse its previous ruling and allow him to recall Jane and Maurer and ask them about "the sexual episodes that were described in Mary Maurer's notes." In addition to Jane losing her virginity, Linney wanted to inquire about Maurer's notes from June 30, 2010, which indicated that Jane had engaged in sexual intercourse with multiple partners simultaneously. Linney argued that Maurer testified Jane's sexual acting out was one of the behaviors Maurer factored into her PTSD diagnosis. But the State correctly pointed out that Maurer diagnosed Jane with PTSD in 2008 when Jane was still a virgin.

Linney then argued he had the constitutional right to ask Jane and Maurer about those sexual episodes to establish that his alleged assault had not precipitated such behavior, but that Jane "independently . . . engaged in those sexual episodes of her own free[]will." But the relevance of establishing such a point is unclear. Dr. Thompson did not testify that the sexual acting out commonly seen in child victims does not result from free will. Further, although neither Maurer nor Dr. Thompson defined sexual "acting out," it is reasonable to presume that not all sexual behavior

18

falls within that category, and nothing in the record suggests that Jane losing her virginity at the age of sixteen was an example of "acting out."[8] Accordingly, we conclude the trial court did not abuse its discretion by denying Linney's request to recall Jane and Maurer.

\* \* \*

We conclude that to the extent Linney preserved his first two issues for appeal, the trial court did not violate his constitutional rights to cross-examine witnesses and present a meaningful defense. *See Potier*, 68 S.W.3d at 666; *Lopez*, 18 S.W.3d at 226. Accordingly, we overrule Linney's first and second issues.

### III

In his third issue, Linney contends the trial court erred during the guilt–innocence phase by admitting purported "outcry" testimony from Cindy in contravention of article 38.072 of the Code of Criminal Procedure. Specifically, during direct examination, the prosecutor asked Cindy whether, before the charged offense, Jane mentioned anything about contact between Jane and Linney in the pool. Linney objected, arguing the testimony was hearsay and, alternatively, it was an outcry statement describing an extraneous offense. The prosecutor insisted the testimony was not being offered to prove the truth of the matter asserted but rather to prove Jane's state of mind. The trial judge allowed the testimony for that limited purpose and granted Linney's request for a running objection. The prosecutor then asked, "What did [Jane] say happened in the pool?" Cindy responded, "She said she could feel [Linney] in the pool, that she was uncomfortable." Cindy explained that she had not understood what Jane was trying to tell her because Jane said it in a "general way."

---

[8] On appeal, Linney does not object to the exclusion of the June 2010 event.

19

A

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted and is inadmissible except as provided by statute or otherwise by rule. Tex. R. Evid. 801, 802. The hearsay rule does not exclude a statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition, such as intent, motive, mental feeling, or bodily health. *Id.* 803(3). This exception does not extend to a statement of memory or belief to prove the fact remembered or believed. *Id.* The hearsay rule also does not exclude a statement of a present-sense impression that describes or explains an event or condition and was made while the declarant was perceiving the event or condition or immediately thereafter. *Id.* 803(1). This exception relates to statements about something external to the declarant, whereas the exception for then-existing state of mind pertains to something internal. We review a trial court's evidentiary ruling for an abuse of discretion. *Montgomery v. State*, 810 S.W.2d 372, 378–79 (Tex. Crim. App. 1990).

In this case, Jane's statement that she felt uncomfortable when she could feel Linney in the pool described an emotion, but it is not admissible as a then-existing state of mind because Jane did not make the statement while she was feeling uncomfortable. *See* Tex. R. Evid. 803(3). Similarly, Jane's statement that she could feel Linney in the pool described an external event or condition, but it is not admissible as a present-sense impression because it was not made while or immediately after Jane perceived the event or condition. *See id.* 803(1). Therefore, neither statement satisfies the requirements of the respective hearsay exceptions.

B

Even though the testimony does not satisfy the state-of-mind exceptions to the hearsay rule, it may still be admissible under article 38.072. A statement made

20

by a child against whom the charged offense was committed that describes the alleged offense is not excluded by the hearsay rule if certain procedural requirements are met. Tex. Code Crim. Proc. art. 38.072, § 2. But to fall within article 38.072, the description must do more than generally allude that something in the area of child abuse was going on. *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990); *Shaw v. State*, 329 S.W.3d 645, 653 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd).

Cindy's testimony was inadmissible because, first, Jane's statement did no more than generally allude that something in the area of child abuse was going on. *See Garcia*, 792 S.W.2d at 91. Second, even if the statement were sufficiently specific, it was inadmissible during the guilt–innocence phase because it described an extraneous event rather than the charged offense. Therefore, the trial court abused its discretion by overruling Linney's objection.

C

Having held that the trial court abused its discretion, we must determine whether the error is reversible. *See* Tex. R. App. P. 44.2(b). The admission of inadmissible hearsay is non-constitutional error, and it will be considered harmless if, after examining the record as a whole, we are reasonably assured that the error did not influence the jury's verdict or had but a slight effect. *See id.*; *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004); *Chapman v. State*, 150 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). Moreover, improper admission of evidence is not reversible error if the same or similar evidence is admitted without objection at another point in the trial. *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999); *Chapman*, 150 S.W.3d at 814.

During Jane's direct examination, she testified that she told Cindy, "I don't like the way it feels when [Linney] rubs up against me in the pool because I can

feel his penis." Not only is this testimony similar to Cindy's, it is substantively more harmful because Jane specifically mentions being able to feel Linney's penis, which she claimed was erect at the time.

Nevertheless, Linney argues Cindy's testimony was harmful not because of its substance but rather because it tended "to bolster or corroborate [Jane's] account of the extraneous matters and tended to add credence to her testimony." But, although Cindy's testimony may have made the jury more likely to believe Jane said something to Cindy about Linney touching her in the pool, that is not to say it made the jury more likely to believe Jane was being honest to her mother at the time she made that statement. This is particularly true given that Cindy testified she never saw Linney inappropriately touching Jane in the pool. The jury also heard Donna, David, Valerie, and Linney consistently testify that at least one other adult was always present when Linney and Jane were both in the pool, no one ever saw Linney inappropriately touch Jane in the pool, and Jane never expressed hesitation about being in the pool with Linney. Additionally, those witnesses each testified that Jane was not truthful.

Accordingly, having considered the record as a whole, we are reasonably assured that the trial court's erroneous admission of the evidence had but a slight effect, if any effect at all, on the jury's verdict. *See Garcia*, 126 S.W.3d at 927. We overrule Linney's third issue.

## IV

In Linney's fourth issue, he argues the trial court committed reversible error by overruling his objection to Jane's sister Kelly's inadmissible hearsay testimony. The State contends Kelly's testimony was admissible pursuant to the hearsay exception for prior consistent statements.

22

## A

After the defense rested, the State requested permission to reopen its case in chief and call Kelly to testify that Jane told her about the alleged offense before Jane told Cindy. Linney objected, arguing any testimony Kelly would be able to provide would be inadmissible hearsay. The prosecutor countered that the testimony fell within the prior-consistent-statement exception, and the trial court agreed. Kelly was permitted to testify, "[Jane] told me that when she went to babysit with [Steve] . . . and spent the night, that [Linney] put his hand in her pants and she didn't know what to say." Kelly further testified that Jane said "she didn't like to be around [Linney] because he was too touchy."

A witness's prior consistent statement is not hearsay if the statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive and the declarant made the statement before the alleged improper influence or motive arose. Tex. R. Evid. 801(e)(1); *Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007); *Kelly v. State*, 321 S.W.3d 583, 599 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The trial court has substantial discretion to admit a prior consistent statement when there has been "'only a suggestion' of conscious alteration or fabrication." *Hammons*, 239 S.W.3d at 804–05 (quoting *United States v. Frazier*, 469 F.3d 85, 88 (3d Cir. 2006)). But the rule cannot be construed to permit the admission of what would otherwise be hearsay any time a witness's credibility or memory is challenged. *Id.* at 805. There is no bright line between a general challenge to memory or credibility and a suggestion of conscious fabrication, and "the trial court should determine whether the cross-examiner's questions or the tenor of that questioning would reasonably imply an intent by the witness to fabricate." *Id.* A reviewing court, "in assessing whether the cross-examination of a witness makes an *implied*

23

charge of recent fabrication or improper motive, should focus on the purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court." *Id.* at 808 (emphasis in original) (internal quotation marks omitted).

Although Linney's primary defensive theory was that Jane fabricated the offense, there was no suggestion that the alleged fabrication was of recent vintage. The State argues instead that Kelly's prior-consistent-statement testimony is necessary to overcome suggestions by the defense that Jane was improperly influenced by other witnesses when giving her statement and answering questions at the CAC. Nevertheless, Linney's cross-examination of those witnesses did not imply that anything about the CAC interview improperly influenced Jane to allege that Linney touched her. Rather, Linney suggested the interview improperly influenced her to report emotional symptoms that she was not actually experiencing. Kelly's testimony served no rehabilitative function as to that evidence.

Additionally, although Linney's counsel began cross-examination of Jane by eliciting testimony that she met with "four other D.A.s, doctors, [and her] parents," to help her anticipate the questions she may be asked during trial, he did not imply that Jane was influenced to fabricate the offense by those preparations. Instead, after asking Jane about how she had prepared for trial, Linney asked her about inconsistencies between her statements to Dr. Pereira and her testimony at trial. And later, during Linney's closing argument, he suggested Jane had been coached on how to answer certain difficult questions about her actions on the morning of the alleged offense, such as why she did not go with Valerie to get doughnuts or why she did not call her father sooner. Again, Kelly's testimony served no rehabilitative function as to that suggestion.

We thus conclude that the trial court abused its discretion by overruling Linney's objection to Jane's testimony. But we should not overturn the conviction unless, after examining the record as a whole, we conclude that an error may have had "substantial influence" on the outcome of the proceeding. *See Burnett v. State*, 88 S.W.3d 633, 637 (Tex. Crim. App. 2002).

B

In this case, the trial court's error was harmless. Kelly testified that Jane told her Linney put his hand down Jane's pants, but the jury found Linney not guilty of the count related to allegedly touching Jane's vagina. Kelly also testified that Jane said she did not like to be around Linney because he was "too touchy," but Jane gave similar testimony without objection.

Linney argues Kelly's testimony was damaging because of its tendency to bolster Jane's credibility, but any tendency to do so was mitigated by the substantial testimony contradicting Jane's allegations about Linney improperly touching her and about her feeling uncomfortable around him. As previously discussed, Donna, David, Valerie, and Linney all testified that Linney and Jane were never alone in the pool and that no one ever saw him improperly touching her. Donna and David also both testified that they never saw Jane being reluctant to talk to or play with Linney, and they never saw her get out of the pool when he got in or stay out of the pool when Linney was already swimming.

Therefore, after examining the record as a whole, we are reasonably assured that the trial court's error did not have more than a slight effect, if any, on the jury's verdict. *See Garcia*, 126 S.W.3d at 927. Accordingly, we overrule Linney's fourth issue.

25

## V

In Linney's fifth issue, he argues that the cumulative effect of the errors set forth in his first four issues merits reversal even if no single error, considered alone, is deemed reversible.

A number of errors, even if harmless when separately considered, may be harmful in their cumulative effect. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) (citing *Stahl v. State*, 749 S.W.2d 826, 832 (Tex. Crim. App. 1988)); *Melancon v. State*, 66 S.W.3d 375, 385 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (en banc). Non-errors, however, may not produce harm in their cumulative effect. *Hughes v. State*, 24 S.W.3d 833, 844 (Tex. Crim. App. 2000); *Melancon*, 66 S.W.3d at 385. This doctrine provides relief only if the cumulative effect rendered the phase of the trial fundamentally unfair. *See Estrada v. State*, 313 S.W.3d 274, 311 (Tex. Crim. App. 2010) (citing *United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004)).

In his brief, Linney cites authority for the law of reversible cumulative harm, but offers only two sentences to explain his position:

> It is respectfully submitted that the errors herein demonstrate that the trial court abused its discretion in the rulings that it made, and as a result, when viewed separately or cumulatively, the substantial rights of the appellant were adversely affected. Tex. R. App. P. 44.2(b). In addition, it cannot be said beyond a reasonable doubt that the errors set forth in Points of Error One and Two did not contribute to the conviction or punishment herein.

As explained above, to the limited extent Linney has preserved for review the errors alleged in his first two issues, he has demonstrated no error. Further, we do not see how the trial court's two erroneous evidentiary rulings resulted in a fundamentally unfair trial for Linney. We need not decide this issue, however, because Linney's conclusory statement that the cumulative harm of the trial court's

26

errors adversely affected his substantial rights is insufficient to maintain his burden to adequately brief the point of error. *See* Tex. R. App. P. 38.1(i); *Swearingen v. State*, 101 S.W.3d 89, 100 (Tex. Crim. App. 2003) (finding issue inadequately briefed because appellant failed to apply law to facts as required under appellate rules); *Vuong v. State*, 830 S.W.2d 929, 940 (Tex. Crim. App. 1992) (concluding appellant's issue was inadequately briefed because he cited no legal authority to support his argument). Therefore, because this issue is inadequately briefed, Linney presents nothing for review.

Accordingly, we overrule Linney's fifth issue.

\* \* \*

For the foregoing reasons, we affirm the judgment of the trial court.

/s/    Jeffrey V. Brown
       Justice

Panel consists of Chief Justice Hedges and Justices Brown and Busby.
Publish — TEX. R. APP. P. 47.2(b).