COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| JESSE FARIAS | § | No. 08-23-00234-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 379th Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | § | Of Bexar County, Texas |
| Appellee. | § | (TC# 2021CR9469) |
| | § | |

**MEMORANDUM OPINION**

Appellant Jesse Farias was charged with three counts of indecency with a child by contact. The jury acquitted Appellant of two but found him guilty of the third count and sentenced him to six years in prison. On appeal, Appellant argues: (1) the trial court abused its discretion when it failed to hold a hearing on his motion for new trial; (2) the evidence is insufficient to sustain the jury's verdict; (3) the trial court deprived Appellant of his constitutional right to assert a meaningful defense; and (4) the trial court erred in allowing two witnesses to testify to the victim's out-of-court statements under the excited-utterance exception to the hearsay rule. For the reasons set forth below, we affirm.[1]

---

[1] This case was transferred from the Fourth Court of Appeals pursuant to a docket equalization order issued by the

# FACTUAL AND PROCEDURAL BACKGROUND

### A. The victim's initial outcry

On the evening of February 27, 2021, the victim, S.F., Appellant's niece, who was 16 years old at the time, was spending the night at the nearby home of her close friend, H.L., where she frequently spent time.[2] H.L.'s parents, Richard and Maria Lopez, had left the home earlier in the evening to have dinner with Appellant and his wife, Yvette, who were close family friends. After the four of them returned to the Lopez home, the two wives remained in front of the house talking, while Appellant and Richard went into the backyard. Despite the late hour, at some point, S.F. and H.L. went into the backyard to play volleyball.

After the volleyball got stuck on the roof, S.F. climbed a ladder to retrieve the ball. At trial, H.L. testified that while S.F. was descending the ladder, Appellant "reached his hand up and touched [S.F.'s] butt," even though S.F. was not falling and there was no reason for him to touch her. S.F. confirmed that Appellant had "touched [her] butt" and recalled that she used her leg to kick his hand away.[3] According to H.L., although she thought Appellant's behavior was "strange" and might be an accident, she soon realized it was not.

Shortly thereafter, Appellant picked up S.F.'s cell phone from a patio table and began looking through her photos. After S.F. took her phone back, Appellant picked up H.L.'s phone from the table and began scrolling through her photos, complimenting how she looked. According to H.L., Appellant then asked: "Where are the good photos, like the after-hour photos?" H.L.

---

Supreme Court of Texas. *See* Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

[2] To protect the identity of the victim, who was a juvenile at the time, we refer to her by the initials, S.F., in place of her true name. *See* Tex. R. App. P. 9.10. Similarly, we refer to S.F.'s friend, who was also a juvenile, as H.L.

[3] H.L. did not recall seeing her kick Appellant.

interpreted this to mean "nude photos" and told him that she did not have any. S.F. heard his question too and interpreted it to mean "pictures that were inappropriate." H.L. recalled that Appellant then told her that she was "so beautiful that he could make out with [her]."

Though H.L. did not hear Appellant's last comment, after getting her phone back, H.L. texted S.F. to inform her of what Appellant had said. The girls decided to report the incident to H.L.'s brothers, and while doing so, S.F. texted H.L., stating, "I have a feeling I should tell them what he did to me."[4] H.L.'s brother, Brandon, testified at trial that H.L. woke him up that night and informed him Appellant was acting "weird." Upon observing that H.L. appeared "very scared," "pale," and in a "panic," he went to look for his parents. Before he could speak with them, Appellant entered the house, and Brandon immediately asked him to leave. According to Brandon, Appellant did not respond or say anything, and just walked out of the house through the front door without saying goodbye to his father who was still in the backyard.[5] Appellant then found his wife outside in the front yard and they left together.

S.F. testified that after Appellant and his wife left, Maria Lopez entered the house, and while she, H.L., H.L.'s brothers, and Maria were all gathered in the kitchen, S.F. made an outcry that Appellant had been touching her. Over Appellant's hearsay objection, H.L. was allowed to testify at trial that she heard S.F. say that Appellant "had been touching her for months before." Richard testified at trial, also over Appellant's hearsay objection, that although he was not in the house when the outcry was made, he came inside shortly thereafter to find the group distraught, and his wife informed him that S.F. had told her that Appellant "had touched [her] and that he had

---

[4] The text between the two girls was admitted into evidence at trial.

[5] Appellant denied that he was asked to leave, asserting that he voluntarily left the house after saying goodbye to Richard because he intended to get up early for church the next day.

3

been doing things to [her].[6]

The Lopez family then called the police as well as S.F.'s mother, Sandra. At trial, Sandra, who arrived at the Lopez residence before the police, testified that upon her arrival, everyone in the home appeared to be upset and angry. She further recalled S.F. was crying, shaking, hyperventilating, and having what she later believed to be a "panic attack." Sandra testified that S.F. informed her Appellant had been "touching" her. Sandra immediately called her sister, Yvette, to report the allegations. While Yvette was on speakerphone, she informed Yvette of S.F.'s allegations and threatened to call the police. Appellant, who was listening to the conversation, told her to go ahead and call the police. At trial, Appellant testified that he did so because he "did nothing."

Officer Valentin Figueroa testified at trial that he was dispatched to the Lopez residence at approximately midnight for a call regarding the sexual assault of a child. While wearing a bodycam, he interviewed the various individuals who were present at the home. The video of his interviews was played for the jury without audio, while he narrated what was occurring. Officer Figueroa described the individuals at the home as being "distraught" and in "disbelief." He recalled that after speaking with the other individuals at the scene, he interviewed S.F. with her mother present. He described S.F. as appearing "sad" and "distraught," as she informed him of the "events that had happened that very same evening" as well as "events that had happened before in her life." Based on his interviews, Officer Figueroa concluded that the suspect was S.F.'s uncle, Jesse Farias, who had already left the home. He further concluded in his report that the offense Appellant was suspected of committing was "indecency with a child, contact."[7] On cross-examination, Officer

---

[6] Richard explained that his wife, Maria, was unable to testify at trial as she suffered a stroke that impaired her speech.

[7] Office Figueroa explained that he did not order a SANE exam based on S.F.'s allegations, as such exams are only ordered when a victim has made a report of abuse within 120 hours of its occurrence.

Figueroa testified that S.F. talked about the "touching" that had "happened to her" that night, but that her friend, H.L., did not mention the touching incident that occurred that night. H.L. explained at trial that she did not report the incident, as she was afraid of what her father might to do Appellant.

**B. The forensic interview and therapy**

In March 2021, Sandra took S.F. for a forensic interview. The forensic investigator testified, without objection, that S.F. informed him Appellant had touched her on more than one occasion and provided him a "very detailed" account of the incidents, which led him to believe she had made a "valid outcry of more than one instance of sexual abuse." On cross-examination, he recalled that S.F. told him some, but not all, of the incidents occurred in Appellant's vehicle while he was picking her up from school.

A ChildSafe therapist subsequently conducted approximately 26 therapy sessions with S.F. between November 2021 and July 2022. At trial, S.F.'s therapist testified, without objection, that S.F. had informed her Appellant had "sexually abused her."

**C. Appellant's indictment and trial**

Appellant was initially indicted in October 2021 on one count of sexual abuse of a child and three counts of indecency with a child by contact. The State later amended the indictment to allege three counts of indecency with a child, with regard to: (1) an incident occurring on or about March 27, 2020, in which Appellant "touch[ed] part of the genitals of [S.F.] with the intent to arouse or gratify the sexual desires of any person"; (2) an incident occurring on or about March 27, 2019, alleging the same conduct; and (3) an incident occurring on or about March 27, 2019, in which Appellant "touch[ed] the breast of [S.F.] with the intent to arouse or gratify the sexual desires of any person." After pleading not guilty, Appellant's jury trial was held in July 2023.

5

**(1)   S.F.'s trial testimony regarding allegations in the indictment**

S.F., who was 18 at the time of trial, testified that she and her family were very close to Appellant and his family, including Appellant's three children, and that she often spent time with them prior to the COVID-19 pandemic. S.F. testified that the 2019 incidents occurred when she was in eighth and ninth grade, while Appellant was picking her up from school in the afternoon. S.F. recalled that during that time, her mother was responsible for dropping her and her two younger cousins at school in the morning, and Appellant would pick them up in the afternoon. According to S.F., he would pick her up first and they would wait for her two younger cousins to come out to the van, as they were released from a different building. S.F. further testified that Appellant's wife, Yvette, was typically working in the afternoon and would therefore not accompany him, leaving her alone with Appellant for several minutes in his vehicle while waiting for her younger cousins to arrive.

S.F. recalled that when they were alone, Appellant would often make her feel "very uncomfortable" by asking her "very sexual, uncomfortable questions," such as whether she "ever had sex before," whether she had "ever touched [herself]," and whether she "would watch . . . sexual videos. She also recalled that he had asked to "see her boobs" and asked to "touch them." According to S.F., he would sometimes touch her thighs when talking to her, and when she would tell him to stop and pushed his hands away, he would just laugh it off and say he was "kidding."

With respect to the two 2019 allegations in the indictment, S.F. described two specific incidents that occurred in Appellant's vehicle in the school pickup line that year. The first incident was an occasion during which Appellant touched her upper thigh, rubbing it up and down multiple times. The second was an occasion during which he used his finger to poke one of her breasts through her clothing. She recalled telling him to stop and pushing his hands away, and Appellant

6

thereafter laughed about the encounter. She acknowledged that she never said anything to her cousins or other family members about Appellant's conduct in the pickup line, but she eventually started to wait to get into Appellant's vehicle until after her cousins got in to avoid being alone with him.

S.F. then described the events surrounding the 2020 allegation in the indictment, recalling that they occurred during the COVID-19 pandemic. After her school closed, she would typically do online school at her house or at the Lopez home. She recalled that although she was avoiding going to Appellant's home during this time, she went at his request one day when her mother was at work so she could do online school with her cousins. S.F. testified that at some point during the day, her youngest cousin, J.J., told her Appellant wanted to see her in his bedroom. She complied, believing he wanted to speak with her about something. S.F. recalled that after she entered the room, Appellant closed the door and locked it, first telling her to sit on the bed, then telling her to lay down on it. She testified that although she initially said no, she eventually reclined on the bed, and Appellant "started touching [her]," even though she asked him to stop. She recalled that he also began asking her the same type of "uncomfortable questions" he had asked her while they were in the pickup line at school, such as whether she touched herself and whether she had sex. According to S.F., Appellant then pulled down her pajama bottoms and the spandex shorts she had on underneath, and used his hands to touch her vagina. S.F. recalled that she tried to pull up her shorts but Appellant would not let her, and although she told Appellant to stop, she did not scream for help because she was in shock. After she was able to get up to leave the room, she recalled Appellant asking her if she had ever seen a penis. She replied no, and she then observed his hands go to his pants to unzip them. S.F. went to her cousin's room to continue with her online schooling but did not report the incident to her cousin or anyone else at the time because she was scared.

7

On cross-examination, the defense questioned S.F. about a note she had written prior to her forensic interview at ChildSafe to assist her in recalling the details of Appellant's abuse. In the note, she indicated Appellant had used a "massager" during their encounter in the bedroom.[8] S.F. acknowledged writing the note, but explained she had forgotten to mention the massager in her earlier testimony. On redirect, she testified that Appellant had initially used the massager on her vagina and asked her if it felt good, after which he used his finger to touch her vagina.

S.F. also described a subsequent occasion during which Appellant called her into his bedroom, and after closing the door, gave her a hug and said he loved her. According to S.F., Appellant offered to give her $20 if she promised not to tell anyone what had happened. She rejected his offer and left the room. According to S.F. she stopped going to Appellant's house after that last incident. However, she still did not tell anyone about Appellant's conduct at that time, as she was scared of breaking up the family.

### (2) Sandra's trial testimony

At trial, S.F.'s mother, Sandra, testified that before S.F. told her Appellant had been touching her, she was not aware of any wrongful conduct. However, she recalled noticing changes in S.F.'s attitude toward Appellant, explaining that although they had previously been close, S.F. had started to "shy away" from him and appeared to be "uncomfortable" around him.

Sandra also confirmed that Appellant was primarily responsible for picking up S.F. and her cousins after school in the afternoon. Sandra believed Yvette would go with Appellant when she was available, but Appellant "was in charge" of the children when Yvette was working. Sandra explained that because she and Yvette often worked together in the afternoon, she believed there were occasions when Yvette would not be with Appellant in the pickup line, and Appellant would

---

[8] The State had earlier introduced the note into evidence.

therefore be alone with the children on occasion.

### (3) Appellant's defense

At trial, Appellant denied all of S.F.'s allegations. He contended S.F. was lying, and he never touched her. In an attempt to explain why S.F. may have fabricated her allegations, Appellant recalled that on the night of S.F.'s outcry, he was looking through H.L.'s phone as a "joke," when he saw an inappropriate video of H.L. on her phone, which H.L.'s father saw as well. He therefore argued to the jury that S.F. and H.L. had "conspired" to make up their accusations against him out of fear they were in trouble because of the video.

Appellant then sought to contradict S.F.'s testimony that he was alone with her in the school pickup line at times. Appellant testified that he was never alone in his vehicle with S.F. when he picked up the children from school, as Yvette was always with him, and the school's protocol required him to pick up his children before he picked up S.F., who was in an older grade and in a different part of the school. Appellant's youngest son, J.J., however recalled that although his mother was typically with Appellant in the pickup line, there were "very few" times that she was not there. Though Yvette initially testified that she was "always" with Appellant, she later clarified that she meant she was with Appellant "for the most part" during school pickups.[9] They all agreed, however, that Appellant always picked up S.F. last due to the school's protocol, she was never alone with Appellant in the vehicle, and S.F. always sat in the backseat.

Appellant also sought to contradict S.F.'s claim that she was at his home during the pandemic. Appellant, his wife, and their children all testified that although S.F. would occasionally visit the home before the pandemic, S.F. never came to the house during the pandemic, as the

---

[9] Although his daughter initially testified that her mother was always with Appellant during school pickup, she later testified that when her mother was not there, her brother would sit in the front seat with Appellant.

family was very strict about not allowing visitors during that time.[10]  In addition, Appellant's son, J.J., expressly denied that he ever asked S.F. to meet with his father in his bedroom during any of her visits, and he further testified that he never heard any of his siblings do so either. Finally, Appellant's family members also testified that none of the bedroom doors had locks on them, and the only massager in the home was a "back massager" they described as large, heavy, and loud, making it unsuitable for a "sex toy."

During closing argument, defense counsel argued that in light of this testimony, it would have been "impossible" for Appellant to have committed any of the incidents described by S.F., and the jury should therefore acquit Appellant of all of the charges against him.

### (4)  The jury's verdict and Appellant's motion for new trial

The jury acquitted Appellant of the two counts relating to the 2019 incidents in the school pickup line, but found Appellant guilty of the first count in which he was accused of touching S.F.'s genitals in 2020. The jury sentenced Appellant to six years in prison.

Appellant filed a motion for new trial, which was verified by his attorney, contending that a juror had contacted Appellant's sister, stating she believed the jury had engaged in misconduct during deliberations by taking their notebooks into the jury deliberation room in violation of the trial court's instructions. The trial court did not rule on the motion or on Appellant's request for a hearing on the motion. It was denied by operation of law. This appeal followed.

### SUFFICIENCY OF THE EVIDENCE

We start with Appellant's second issue on appeal, in which he contends there was "factually" insufficient evidence to support his conviction.

---

[10] Appellant's oldest daughter, however, testified that the family was only strict about quarantining for two or three months after the pandemic started.

## A. Standard of review

Under the Due Process Clause of the United States Constitution, the State is required to prove every element of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979). While Appellant utilizes a factual sufficiency standard for determining the sufficiency of the evidence, we consider his sufficiency argument under the correct standard. We use legal sufficiency, as articulated by the U.S. Supreme Court in *Jackson*, as the standard of review to determine the sufficiency of the evidence supporting a defendant's conviction. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010).

Under a legal sufficiency standard, we view the evidence "in the light most favorable to the verdict." *Id.* at 899–900 (citing *Jackson*, 443 U.S. at 319). The jury is the "sole judge of the witnesses' credibility and the weight to be given their testimony," i.e., "the jury can believe all, some, or none of a witness's testimony." *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). On review, we must defer to the jury's credibility and weight determinations. *Brooks*, 323 S.W.3d at 912; *see also Dobbs v. State*, 434 S.W.3d 166, 170 (Tex. Crim. App. 2014). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact-finder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *see also Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014) (holding that a reviewing court should not act as a "thirteenth juror" by overturning a jury's credibility and weight determinations).

The legal sufficiency "standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018) (quoting *Jackson*, 443 U.S. at 319). It is firmly within the jury's province to resolve conflicts in testimony, and we must presume the jury resolved any conflicting inferences in the record in favor

11

of the verdict. *Dobbs*, 434 S.W.3d at 170 (citing *Jackson*, 443 U.S. at 319). A jury's verdict will be upheld if any rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005).

### B. Applicable law

A person commits the offense of indecency with a child "if, with a child younger than 17 years of age, whether the child is of the same or opposite sex and regardless of whether the person knows the age of the child at the time of the offense, the person . . .engages in sexual contact with the child or causes the child to engage in sexual contact." Tex. Pen. Code Ann. § 21.11 (a)(1). In this Code section, "'sexual contact' means the following acts, if committed with the intent to arouse or gratify the sexual desire of any person: (1) any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child; or (2) any touching of any part of the body of a child, including touching through clothing, with the anus, breast, or any part of the genitals of a person." Tex. Pen. Code Ann. § 21.11 (c)(1)(2). "In the context of indecency with a child, the factfinder can infer intent to arouse or gratify sexual desire from the defendant's conduct, remarks, and all the surrounding circumstances." *Monsivais v. State*, No. 04-19-00829-CR, 2021 WL 2668837, at *4–5 (Tex. App.—San Antonio June 30, 2021, no pet.) (mem. op., not designated for publication) (citing *Keller v. State*, 604 S.W.3d 214, 226 (Tex. App.—Dallas 2020, pet. ref'd); *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981)).

In general, a child-victim's testimony, standing alone, is sufficient to support a conviction for indecency with a child by contact. *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San

Antonio 2010, pet. ref'd) (citing Tex. Code Crim. Proc. Ann. art. 38.07[11]); *Tucker v. State*, 456 S.W.3d 194, 208 (Tex. App.—San Antonio 2014, pet. ref'd) (recognizing same). We also recognize that "[c]hild victims of sexual crimes are afforded great latitude when testifying and they are not expected to testify with the same clarity and ability as is expected of a mature and capable adult." *Hiatt*, 319 S.W.3d at 121 (citing *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990)); *see also Tucker*, 456 S.W.3d at 208 (recognizing same).

### C. Analysis

As set forth above, S.F. provided a detailed account of the incident for which Appellant was convicted, recalling that Appellant had used his hand to touch her vagina as alleged in the indictment. Appellant, however, contends there were no other witnesses to this event—despite that other individuals were in the home at the time of the alleged incident and the detective "did not do any independent investigation into this incident" to corroborate the allegations. However, S.F.'s testimony, standing alone, was sufficient to support the conviction; no corroboration of her allegations was necessary.

Appellant contends S.F.'s testimony was wholly unbelievable, pointing to the inconsistencies regarding her initial failure to mention that Appellant had used a massager during the alleged incident and the "contrary evidence" he and his family presented, which he claims made S.F.'s story "impossible" to believe.[12] According to Appellant, this "contrary evidence" was

---

[11] Article 38.07 provides that "(a) A conviction under Chapter 21, Section 20A.02(a)(3), (4), (7), or (8), Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred. (b) The requirement that the victim inform another person of an alleged offense does not apply if at the time of the alleged offense the victim was a person: (1) 17 years of age or younger." Tex. Code Crim. Proc. Ann. art. 38.07 (a)(b).

[12] Appellant also contends S.F.'s credibility was called into question because she never informed anyone of the alleged abuse until the night of her outcry, even though she claimed Appellant's abuse had gone on for at least two years. As set forth above, however, S.F. testified that she did not initially report the abuse because she was scared and did not

13

"so strong" that when "weighing all the evidence," we should conclude that the State did not meet its burden of establishing his guilt beyond a reasonable doubt.

In conducting a legal sufficiency review, we do not weigh the evidence; instead, we must defer to the trier of fact to resolve any conflicts in the evidence presented at trial. Here, despite any conflicts in the record and any inconsistencies in S.F.'s recollection of the events, S.F. testified to each element of the offense of indecency with a child by contact. The jury was free to believe her testimony and reject the contrary testimony of Appellant and his family members. *See Rios v. State*, No. 04-16-00810-CR, 2018 WL 3369932, at *3 (Tex. App.—San Antonio July 11, 2018, no pet.) (mem. op., not designated for publication) (rejecting defendant's argument that child-victim's testimony was "so internally inconsistent and contradictory to the other evidence that a reasonable fact-finder could not have believed [her] testimony" where she testified to all elements of the offense of aggravated sexual assault of a child); *Bargas v. State*, 252 S.W.3d 876, 889 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (finding child-victim's testimony sufficient to support jury's verdict of sexual assault of a child despite defendant's presentation of contradictory evidence, where victim provided detailed account of the abuse).

Viewing the evidence in the light most favorable to the verdict, as we must, we conclude that a reasonable fact-finder could have found beyond a reasonable doubt that Appellant committed the offense of indecency with a child by touching S.F.'s vagina with his fingers.

Appellant's Issue Two is overruled.

## MOTION FOR NEW TRIAL

In his first issue, Appellant contends the trial court erred by refusing his request for a

---

want to tear the family apart. Appellant has cited no authority, nor are we aware of any, that would render a jury's verdict insufficient based on a child-victim's delay in reporting abuse.

hearing on his motion for new trial.

## A. Background

Following trial, the defense filed a timely, verified motion for new trial alleging Appellant's daughter was contacted by a juror "via messenger" to relay "jury misconduct." Appellant stated that the juror identified herself by name and informed his daughter that she wanted to "clear her conscious [sic]." According to Appellant, the juror expressed concern that the jury had violated the trial court's instructions by taking their notes (on the court-provided notebooks) into the jury room during deliberations. Appellant explained that the trial court had instructed the jurors not to take the notebooks outside the courtroom or use them during deliberations.[13] According to the motion, the juror reported that the jurors had taken their notebooks into the jury room during deliberations "to assist them in reaching a verdict." It further alleged the juror had reported that the court's bailiff, whom Appellant identified by name and badge number, "told the jurors to 'not say anything' about taking their notes into the jury room during deliberations in violation of the court's order." Defense counsel did not include an affidavit from Appellant's sister, the juror, or the bailiff attesting to the facts relating to the alleged misconduct.

## B. Applicable law and standard of review

A motion for new trial is the proper vehicle to preserve allegations of jury misconduct for appeal. *Trout v. State*, 702 S.W.2d 618, 620–21 (Tex. Crim. App. 1985) (en banc). A defendant is

---

[13] The trial court instructed the jury as follows at the start of trial: "I'm going to provide you notebooks. I will give you a caveat with that. When you exit the courtroom, you need to leave the notebooks behind. Those notebooks are for your purposes only. When the trial is over, you are welcome to take those notes. Those notes belong to you. We just don't want anybody to share the notes with each other. The reason for that, sometimes folks ask, is because each of you are a judge in your own rite. Each of you pays attention to what is going on. You not only listen, but you observe, you sense, right, all the things that you obtain through communication, you pay attention to. We don't want anybody in the back saying somehow or another their recollection of events is better than anybody else's because they wrote it down. Sometimes there is more to it than just that. So those notes are for your purposes only. As you exit the courtroom, you'll leave them behind."

entitled to a new trial due to jury misconduct "when the jury has engaged in such misconduct that the defendant did not receive a fair and impartial trial." Tex. R. App. P. 21.3(g). To demonstrate jury misconduct, a defendant must show the misconduct occurred, and it harmed the movant. *Cyr v. State*, 308 S.W.3d 19, 30 (Tex. App.—San Antonio 2009, no pet.).

A defendant is entitled to a hearing on a motion for new trial "if the motion and accompanying affidavit(s) 'rais[e] matters not determinable from the record, upon which the accused could be entitled to relief.'" *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003) (en banc). "To be sufficient to entitle the defendant to a hearing, the motion for new trial and accompanying affidavit(s) 'need not establish a prima facie case for a new trial.'" *Id.* (quoting *Jordan v. State*, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994)). "Rather, they 'must merely reflect that reasonable grounds exist for holding that such relief could be granted.'" *Id.* The hearing is to give the defendant an opportunity to fully develop the matters raised in his motion. *Id.* If the trial court denies a hearing on the motion for new trial and the defendant appeals, the appellate court reviews the decision for abuse of discretion. *Id.*

### C. Failure to provide a supporting affidavit

As the State points out, because jury misconduct is not generally determinable from the record, "[i]t is well established that a motion for new trial complaining of jury misconduct must be supported by the affidavit of a juror, or some other person who was in a position to know the facts, or must state some reason or excuse for failing to produce the affidavits." *See Cyr*, 308 S.W.3d at 30; *see also Trout*, 702 S.W.2d at 620 (holding that motions for new trial alleging jury misconduct must "be supported by the affidavit of a juror or some other person who was in a position to know the facts. Failing this, the motion must state some reason or excuse for the omission of the affidavit."); *McIntire v. State*, 698 S.W.2d 652, 658 (Tex. Crim. App. 1985) (en

16

banc) (recognizing that the policy of requiring affidavits in support of a claim of juror misconduct is to "discourage 'fishing expeditions' in an effort to impeach a jury verdict"). The State contends Appellant did not meet the minimum standard to be entitled to a hearing because he failed to present any affidavits in support of his allegations.

While defense counsel did not present any supporting affidavits, she did attach a verification in which she declared "under penalty of perjury" that the contents of the motion were "true of [her] own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe it to be true." Even if we were to accept defense counsel's verification as a substitute for an affidavit, we would still find it deficient, as defense counsel was not in a position to know the facts regarding the alleged misconduct. *See Cyr* 308 S.W. 3d at 30–31 (finding defense counsel's affidavit alleging juror misconduct was insufficient to support holding a hearing on defendant's motion for new trial where the affidavit did "not reflect that he was in a position to know the facts"); *see also Garcia v. State*, 960 S.W.2d 329, 333–34 (Tex. App.—Corpus Christi–Edinburg 1997, no pet.) (defense counsel's affidavit alleging juror misconduct with "no statement by any of the jurors themselves" was insufficient to support defendant's motion for new trial); *Bernal v. State*, 647 S.W.2d 699, 706 (Tex. App.—San Antonio 1982, no pet.) (trial court did not err in overruling motion for new trial, where appellant's motion was not accompanied by a proper affidavit establishing the alleged juror misconduct).

Moreover, Appellant did not establish an excuse for failing to obtain an affidavit from a person with knowledge of the alleged misconduct; "it is incumbent upon him to show this, and why" the affidavit was not obtainable. *See Stephenson v. State*, 494 S.W.2d 900, 909 (Tex. Crim. App. 1973) (quoting *Moore v. State*, 275 S.W.2d 673, 674 (Tex. Crim. App. 1955)). The Court of Criminal Appeals has explained "this might be done by an affidavit of some person, reciting that

17

a member of the jury had told them of misconduct, followed by affidavit of appellant or in his behalf to the effect that, though requested to do so, such juror had refused to make an affidavit thereto." *Id.*; *see also Harmon v. State*, 889 S.W.2d 521, 525 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd) (recognizing same procedure).

Here, Appellant apparently seeks to excuse the absence of a juror affidavit by pointing out that his attorney filed an application to unseal the contact information for the jurors who sat on his case so that he could "investigate the juror misconduct."[14] He contends that because the trial court did not rule on his application or release the juror information, he was "not able to gain [the juror's] information to interview her and attach her sworn affidavit to the Motion for New Trial." Appellant, however, did not establish, or even allege, that he had no other means by which to contact the juror to obtain an affidavit. Despite having identified the name of the juror in his pleadings and the method by which she had contacted Appellant's sister, defense counsel did not set forth any steps he took to contact her to obtain an affidavit. As the State points out, while defense counsel must seek the trial court's permission to contact a juror while a trial is pending, nothing prevented Appellant's attorney from contacting the juror independently after the trial. *See Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000) (en banc) (recognizing that "nothing prevented counsel from contacting the jurors and attempting to elicit information from them" after trial concluded). In addition, Appellant had the name and badge number of the bailiff he claimed was aware of the alleged misconduct, yet he failed to obtain an affidavit from him or provide any excuse for his failure to do so.

---

[14] Texas Code of Criminal Procedure article 35.29 provides that information collected during jury selection about a person who serves as a juror, including the juror's contact information, is "confidential and may not be disclosed by the court," except on application by a party or the news media requesting disclosure of the information "on a showing of good cause." Tex. Code Crim. Pro. Ann. art. 35.29.

18

Accordingly, we conclude Appellant did not establish an excuse for his failure to submit the necessary affidavits to support his request for a hearing on his motion. *See Limon v. State*, 632 S.W.2d 812, 815 (Tex. App.—Houston [14th Dist.] 1982, pet. ref'd) (concluding that trial court did not abuse its discretion in failing to hold hearing on appellant's motion for new trial where motion did not contain facts showing why he was unable to secure the necessary affidavits to support his claim of juror misconduct).

### D. Failure to allege sufficient facts to warrant a hearing

Finally, we agree with the State that even if we were to overlook Appellant's failure to provide the necessary affidavits to support his motion, he did not allege sufficient facts to establish "reasonable grounds" for concluding that juror misconduct occurred, as required before a trial court must hold a hearing. *See Wallace*, 106 S.W.3d at 108 (setting forth "reasonable grounds" requirement for a hearing); *see also Cyr*, 308 S.W.3d at 31 (holding that even if counsel's affidavit regarding juror misconduct had been sufficient to fulfill the affidavit requirement, it did not establish the existence of reasonable grounds showing that defendant was entitled to relief based on jury misconduct).

As the State points out, although the trial court instructed the jurors that they were not allowed to take their notebooks into the jury room, nothing in the law forbids jurors from doing so.[15] To the contrary, it is well-established that it is within the trial court's discretion to allow jurors to take their notes into the jury room and refer to them during deliberations. *See Hubbard v. State*, 892 S.W.2d 909, 910–11 (Tex. Crim. App. 1995) (en banc); *Price v. State*, 887 S.W.2d 949, 954–55 (Tex. Crim. App. 1994) (recognizing that trial courts should be given discretion "to permit

---

[15] According to the State's brief, even though there is no prohibition in the law prohibiting jurors from taking their notes into the jury room, "it is a common practice in Bexar County for trial courts to disallow this."

juror note-taking" and to instruct the juror on how the notes may be used during deliberations). As the Court of Criminal Appeals has expressly recognized, while it is improper for jurors to share their notes with other jurors "during any phase of the trial other than jury deliberations," it is permissible for jurors to "discuss the contents of [their] notes during . . . deliberations." *Price*, 887 S.W.2d at 955.

The court, however, has cautioned that when there is a dispute in the evidence, jurors should not use their "notes as authority to persuade fellow jurors of what the evidence was during the trial." *Id*. Instead, the jurors should be informed that any "dispute must be settled by the official transcript, for it is the official transcript, rather than any juror's notes, upon which you must base your determination of the facts and, ultimately, your verdict in this case." *Id.* Nothing in Appellant's motion suggests that the jurors misused their notes in this manner; instead, the motion only alleged that the jurors took their notes into the jury room.

Because Appellant's motion did not raise any "reasonable grounds" to suggest that juror misconduct occurred, we conclude the trial court did not abuse its discretion when it did not conduct a hearing on the motion. *See Cyr*, 308 S.W.3d at 31 (concluding that trial court did not abuse its discretion in failing to hold a hearing on defendant's motion for new trial where defense counsel's motion did not allege a sufficient basis for concluding that juror misconduct had occurred).

Appellant's Issue One is overruled.

## THE RIGHT TO PRESENT A DEFENSE

In his third issue, Appellant contends he was denied the right to present a "defensive theory" at trial, in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution, because he was denied the right to introduce evidence that S.F. had made a prior complaint that a

student at school had inappropriately touched her. The State argues Appellant did not preserve this issue for our review, pointing out that although Appellant sought to admit this evidence at trial, he did not argue that its exclusion violated his constitutional rights. The State further contends that even if Appellant preserved this issue for our review, he failed to explain how the exclusion deprived him of his constitutional right to present a defense or that the trial court otherwise erred in excluding the evidence.

## A. Background

At trial, Appellant sought to introduce evidence that S.F had made a complaint that a boy at her school had "touched [her] butt," but the complaint was "dropped" for unknown reasons, contending the evidence was relevant for two purposes. First, Appellant sought to cross-examine Appellant about the complaint, arguing it went to S.F.'s credibility. The State objected on relevance grounds. The trial court stated it would "hold off" on ruling and would let the parties know after it had a chance to consider the issue. As Appellant notes, however, the trial court failed to issue a ruling.

Second, Appellant again sought to introduce the evidence of the prior complaint after S.F. testified at trial that she began suffering from "panic attacks" after her outcry, which she attributed to Appellant's abuse. Appellant argued that S.F.'s testimony had "opened the door" to allowing him to cross-examine her about whether the prior complaint may have been at least a partial cause of her panic attacks. According to Appellant, S.F.'s testimony left a "false impression" that his conduct was the sole cause of her attacks, and he was entitled to "clear up" this impression on cross-examination. The State objected, arguing the prior incident of sexual contact was irrelevant and "highly prejudicial," and therefore not admissible.

The trial court ruled that Appellant would be permitted to question S.F. regarding when

her panic attacks began to address the issue of whether Appellant's abuse was the cause of the attacks. However, the court sustained the State's "403 objection" to the admission of the prior complaint and held that Appellant was to "avoid" questioning S.F. about it.

## B. Standard of review and applicable law

In general, an appellate court reviews a trial court's ruling on the admissibility of evidence for an abuse of discretion. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). We will therefore uphold the trial court's evidentiary ruling unless it lies outside the zone of reasonable disagreement. *Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim. App. 2001). We generally treat any error in a trial court's evidentiary ruling as non-constitutional error under Texas Rule of Appellate Procedure 44.2(b), which requires us to disregard the error unless it affects a defendant's "substantial rights." Tex. R. App. P. 44.2(b).

However, as the Texas Court of Criminal Appeals has recognized, "[t]he Fifth, Sixth, and Fourteenth Amendments to the United States Constitution guarantee the accused in a criminal prosecution the right to a 'meaningful opportunity to present a complete defense.'" *Rogers v. State*, 677 S.W.3d 705, 712 (Tex. Crim. App. 2023); *see also Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986) (recognizing that the Constitution, through either the Due Process Clause of the Fourteenth Amendment or the Compulsory Process or Confrontation Clauses of the Sixth Amendment, "guarantee[] criminal defendants 'a meaningful opportunity to present a complete defense'"). In some instances, evidentiary rulings improperly excluding evidence can "rise to the level of denying [a defendant] the fundamental constitutional rights to present a meaningful defense." *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002) (quoting *Potier v. State*, 68 S.W.3d 657, 663–65 (Tex. Crim. App. 2002) (holding that the exclusion of a defendant's evidence will be constitutional error only "if the evidence forms such a vital portion of the case that exclusion

effectively precludes the defendant from presenting a defense")). To establish such a constitutional violation, the defendant must demonstrate that the trial court's ruling excluding the evidence was both erroneous and "effectively preclude[d] the defendant from presenting a defense."[16] *Rogers*, 677 S.W.3d at 725 (citing *Williams v. State*, 273 S.W.3d 200, 232 (Tex. Crim. App. 2008)). In other words, the defendant must establish that the improperly excluded evidence went to the "heart of the defense." *Id*.

## C. Preservation issues

In his brief, Appellant argues he was denied a "meaningful opportunity to present a defense" when the trial court prohibited him from cross-examining S.F. regarding her prior complaint. As the State points out, however, Appellant did not make this argument in the trial court and therefore did not properly preserve this issue for our review. As the State also correctly points out, to preserve error on appeal, the defendant must make a timely and specific objection or request, and obtain a ruling thereon. Tex. R. App. P. 33.1 (to preserve error, a party must make a "timely request, objection, or motion," and obtain a ruling on it or demonstrate that the trial court refused to rule). An appellant's point of error on appeal must comport with the objection or request made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *see also Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (en banc) (recognizing that "[a]n objection stating one legal theory may not be used to support a different legal theory on appeal.").

Here, Appellant argued that he wished to use the prior complaint to impeach S.F., but he did not explain why he believed it was admissible for that purpose and did not obtain a ruling on

---

[16] The Texas Court of Criminal Appeals provided examples of cases in which a defendant was denied his right to present a meaningful defense, including cases in which the defendant was denied the right to testify under oath; denied the right to present vital evidence of a co-defendant; denied the right to present vital, reliable hearsay evidence, combined with denial of the right to cross-examine a witness; and denied the right to testify to vital evidence about the defense. *See Potier v. State*, 68 S.W.3d 657, 665 (Tex. Crim. App. 2002) (citations omitted). As the court noted, these situations "effectively precluded" the defendants "from presenting a defense at all." *Id.*

whether it was admissible on that basis.[17] Though Appellant obtained a ruling on his request to use the prior complaint to clear up the "false impression" that Appellant's conduct was the sole cause of S.F.'s panic attacks, the request did not preserve the issue of whether he was deprived of his constitutional right to present a defense based on the exclusion of the evidence. As our sister court has recognized, "[t]he right to introduce collateral evidence during cross-examination to correct [a] false impression created by a witness's testimony is distinct from the constitutional right to cross-examine witnesses" to establish a defense in a criminal case. *Linney v. State*, 401 S.W.3d 764, 773 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *see also Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (where appellant only made an evidentiary objection at trial to admission of evidence, court would not treat the objection "as raising a due-process claim" for purposes of appeal).

Even if we were to overlook these preservation issues, Appellant did not satisfy his burden of establishing that his inability to cross-examine S.F. to determine the cause of her panic attacks was vital to his defense.[18] Moreover, as Appellant did not brief the issue of whether the evidence

---

[17] As the State points out, a victim's prior complaint of sexual abuse is only relevant to impeach the victim's credibility when there is evidence to demonstrate that the complaint was unfounded. *See Hughes v. State*, 850 S.W.2d 260, 262–63 (Tex. App.—Fort Worth 1993, pet. ref'd) (where defendant presented no evidence that the victim's prior accusations were false, they were not admissible to impeach the victim's credibility). Appellant did not present any such evidence at trial and simply argued that the complaint had been "dropped." He did not establish why it was dropped and never questioned S.F. on voir dire regarding the reason the complaint was not pursued.

[18] The Fourteenth Court of Appeals considered a similar situation in which the State introduced evidence that a teenage victim of sexual abuse suffered from PTSD after the defendant abused her. *See Linney v. State*, 401 S.W.3d 764, 771 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). The defendant attempted to rebut the inference that he was the cause of her PTSD by introducing evidence of "an extraneous traumatic event" that could have been the cause of her stress, specifically, that the victim had been "rejected by the boy to whom she lost her virginity." *Id.* at 771. The trial court excluded the evidence, and on appeal, the defendant argued that this precluded him from "presenting a defense" at trial. *Id.* at 774. Our sister court concluded that the defendant had not established that the cause of the victim's PTSD was "so vital to [his] defense that its exclusion effectively precluded [him] from presenting a defense. *Id.* To the contrary, the court held that his "primary defense" was that the victim was "a liar," and he was able to pursue that defense through other evidence, including evidence that contradicted the victim's testimony. *Id.* Thus, although the defendant was "unable to . . . present his case to the extent and in the form he desired is not prejudicial where, as here, he was not prevented from presenting the substance of his defense to the jury." *Id.* (citing *Potier v.*

of S.F.'s prior complaint of sexual contact was improperly excluded under Rule 403, he waived that point of error.[19]

Appellant's Issue Three is overruled.

## THE ADMISSIBILITY OF S.F.'S OUT-OF-COURT STATEMENTS

In his fourth and final issue, Appellant contends (1) the trial court abused its discretion by admitting the testimony of H.L. and her father, Richard Lopez, in which they described S.F.'s statements on the night of her outcry under the excited-utterance hearsay exception; and (2) the admission of their testimony, as well as the testimony of S.F.'s mother, Sandra, who also described S.F.'s statements that night, constituted improper bolstering of S.F.'s testimony on the subject.

### A. Background

Initially, the State sought to characterize Sandra as an outcry witness whose testimony regarding S.F.'s out-of-court statements would be excepted from the hearsay rule under Texas Code of Criminal Procedure article 38.072. However, after acknowledging that Sandra did not fit within that exception, the State sought to admit her testimony under the excited-utterance

---

*State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002)). Here, too, the cause of S.F.'s panic attacks was not vital to Appellant's defense. Appellant's primary defense was that S.F. had fabricated her story of abuse, and he was able to present the substance of his defense to the jury by his cross-examining the State's witnesses and presenting his witnesses to contradict S.F.s testimony.

[19] The trial court's decision to exclude the evidence was based on Texas Rule of Evidence 403, which provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. Rule 403. A trial court's decision to exclude evidence under Rule 403 is reviewed for an abuse of discretion. *See Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). Appellant in his brief did not argue that the trial court abused its discretion in excluding the evidence under Rule 403. *See* Tex. R. App. P. 38.1(i) (to properly raise an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities"). Accordingly, this point of error was waived. *See Russeau v. State*, 171 S.W.3d 871, 881 (Tex. Crim. App. 2005) (appellant waives an issue by not providing supporting argument, analysis, and citations to authorities and to the record in his brief).

25

exception to the hearsay rule, given S.F.'s distraught emotional state when she made her outcry.[20]

Appellant's attorney agreed to allow Sandra to testify under that exception, but only if her testimony was limited to what S.F. told her that night, and not include any incidents S.F. later described to her. Sandra thereafter testified, in general terms, that when she arrived at the Lopez home on the night in question, S.F. told her Appellant "has been touching me."

However, when H.L. was asked what S.F. told her that night, defense counsel objected that the prosecutor was seeking to elicit hearsay testimony from H.L. The State countered that, as was the case with Sandra's testimony, H.L.'s testimony came under the excited-utterance exception, pointing out that S.F. was "highly emotional" when speaking with S.F. The trial court agreed with the State, and H.L. testified that S.F. told her Appellant "had been touching her for months before." Defense counsel also raised a hearsay objection when the State asked Richard what his wife told him about S.F.'s outcry that night. Once again, the State relied on the excited-utterance exception, arguing the wife's statements were admissible under this exception because she was "hysterical" when she spoke with Richard. The trial court overruled Appellant's objection, and Richard testified that his wife informed him that Appellant "had touched [S.F.] and that he had been doing things to [S.F.]."

## B. The hearsay issue

Appellant now contends the trial court erred in allowing H.L. and Richard to testify regarding S.F.'s out-of-court statements on the night of her outcry because her statements

---

[20] In its current form, Article 38.072 excepts from the hearsay rule statements made by a child-victim younger than 18 years of age to an "outcry" witness (the first adult over 18 years of age to whom the child reported her specific allegation) for certain sexual and assaultive offenses. Tex. Code Crim. Pro. Ann. art. 38.072. However, prior to a 2023 amendment that went into effect on September 1, 2023, the outcry exception only applied to statements made by a child-victim who was younger than 14 years of age. *See* Acts 2023, 88th Leg., ch. 93 (S.B. 1527), § 3.01, eff. Sept. 1, 2023. Because Appellant's trial was held in July of that year, the amendment was not in effect at that time. And because S.F. was 15 years old at the time of her outcry, the State agreed that the outcry statute did not allow Sandra to testify as an outcry witness.

constituted hearsay that did not fit under the excited-utterance exception. Appellant correctly points out that to be admissible as an excited utterance, the out-of-court statement must relate to "a startling event or condition, made while the declarant was under the stress of excitement that it caused." Tex. R. Evid. Rule 803 (2); *see also McFarland v. State*, 845 S.W.2d 824, 846 (Tex. Crim. App. 1992) (en banc) (recognizing that although a trial court may consider a variety of factors in determining whether a statement fits under the excited-utterance exception, "the critical factor is whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event" when the statement was made). And he argues that the evidence did not establish that S.F.'s statements related to any "startling event" that occurred that night, or that she was emotional due to Appellant's conduct that night. Instead, he contends S.F. herself testified that she was emotional solely because of the outcry itself, pointing to S.F.'s testimony that she was "in shock that [she] was finally about to speak up about it." We need not decide, however, whether the trial court abused its discretion in allowing the challenged testimony under the excited-utterance exception, as it was cumulative of the other testimony at trial regarding S.F.'s out-of-court statements.

To preserve error in admitting evidence, "a party must make a proper objection and get a ruling on that objection [and] must object each time the inadmissible evidence is offered or obtain a running objection." *Lane v. State*, 151 S.W.3d 188, 192–93 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W. 3d 500, 509 (Tex. Crim. App. 2003)). Any error "in the admission of evidence is cured where the same evidence comes in elsewhere without objection." *Id*. Thus, a party may not complain on appeal about improperly admitted evidence if the same or similar evidence is admitted without objection at another point in the trial, either before or after the admission of the disputed evidence. *Leday*, 983 S.W.2d at 718. Nor may a party complain when he has either agreed to the admission of the evidence or elicited the evidence himself. *See Estrada*

*v. State*, 313 S.W.3d 274, 302 (Tex. Crim. App. 2010) (where appellant stated he had "no objection" to the admission of evidence, he "failed to preserve any error in the admission of the evidence"); *see also Peralta v. State*, 338 S.W.3d 598, 608–09 (Tex. App.—El Paso 2010, no pet.) (any error in admitting police officer's testimony regarding victim's out-of-court statements under the excited-utterance exception was not preserved where appellant "elicited the complained of testimony himself on cross examination").

Here, Appellant not only agreed to the admission of Sandra's testimony describing S.F.'s outcry, but he also failed to object when Officer Figueroa provided substantially similar testimony. And when cross-examining Richard, defense counsel expressly questioned him about what he heard on the night of the outcry, and he responded that he heard, "[t]hat [Appellant] had touched [S.F.]." We therefore conclude that any error in admitting either the testimony of Richard or H.L. pertaining to S.F.'s out-of-court statements was cured due to Appellant's failure to object to the admission of other evidence on the same subject, and by his conduct in both agreeing to and eliciting testimony from other witnesses at trial on the same subject.

## C. Appellant's bolstering complaint

We similarly conclude that Appellant did not preserve error with respect to his complaint that the testimony presented by H.L., Richard, and Sandra regarding S.F.'s out-of-court statements was improperly admitted "solely to bolster" S.F.'s credibility. Though Appellant made a hearsay objection to the admission of the testimony of H.L. and Richard, he failed to make a "bolstering" objection to their testimony. Appellant's hearsay objection did not preserve his "bolstering" complaint with respect to the testimony of H.L. and Richard. *See Turro v. State*, 950 S.W.2d 390, 403–04 (Tex. App.—Fort Worth 1997, pet. ref'd) (where defendant at trial objected to witness's testimony on hearsay grounds but did not object on bolstering grounds, defendant failed to preserve

28

the latter for appellate review).

Moreover, because defense counsel expressly agreed to allow Sandra to testify to what S.F. told her on the night of her outcry, he cannot be heard to complain on appeal about the admission of her testimony. *See Estrada*, 313 S.W.3d at 302 (defendant could not complain on appeal about admission of evidence when he stated that he had "no objection" to it at trial); *see also Ruffins v. State*, 666 S.W.3d 636, 642 (Tex. Crim. App. 2023) (recognizing that a defendant may be estopped from raising a point of error on appeal if doing so is "inconsistent with [his] prior conduct" at trial).

Accordingly, we conclude that Appellant may not raise his bolstering complaint with respect to any of these witnesses for the first time on appeal. [21]

Appellant's Issue Four is overruled.

## CONCLUSION

The trial court's judgment is affirmed.

LISA J. SOTO, Justice

July 9, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)

---

[21] We further note that Appellant did not cite any authority in support of his bolstering argument, and therefore, even if we were to find that the argument was not waived, we would decline to review the argument based on briefing waiver. *See* Tex. R. App. P. 38.1(i) (an appellate "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record").