

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00209-CR

———————————————

DEDRICK DEWAYNE DAVIS, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court No. 1868811

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

**MEMORANDUM OPINION**

Appellant Dedrick Dewayne Davis was convicted of aggravated assault against a family member causing serious bodily injury with a deadly weapon, namely, his hands (Count One); aggravated assault of a family member with a deadly weapon, namely, a knife (Count Three); assault of a family member by occlusion while using or exhibiting a deadly weapon, namely, his hands, with a prior conviction for family-violence assault (Count Four); and assault against a family member with a previous conviction (Count Five).[1] *See* Tex. Penal Code §§ 22.01(b)(2)(A), (b-3), 22.02(a)(2), (b)(1)(A). On appeal, Davis argues in three issues that (1) the evidence is insufficient to support a finding that he used a deadly weapon while committing Counts One, Three, and Four; (2) the evidence is insufficient to support a finding that he caused serious bodily injury to the complainant as alleged in Count One; and (3) that the trial court violated his constitutional right to confront the witnesses against him by overruling his hearsay objections to certain testimony offered by a police officer during the trial's punishment phase. We affirm.

## I. BACKGROUND

Davis and the complainant, Brittney Tyson, began dating in February or March of 2023. About two or three months into the relationship, Davis became physically

---

[1]Davis was also indicted for aggravated assault causing serious bodily injury with a family-violence allegation (Count Two). *See* Tex. Penal Code § 22.02(a)(1). But because the jury convicted Davis of Count One, it did not consider Count Two.

abusive and controlling. The first incident of physical violence occurred while the couple was driving to a comedy show. Davis, who had been upset for unknown reasons when he picked up Tyson, punched her in the cheek on the way to the show. After this first assault, the couple stopped talking for a few weeks. But Davis eventually reached out, and they continued their relationship.

But a short time later, Davis assaulted Tyson again. After Davis saw a text message about Tyson's three-year-old daughter from the child's father, Davis became enraged and started hitting Tyson over and over again with his fists and hands. He also strangled her before hitting her a few more times. Davis showed no remorse after this attack and instead just acted "like [everything] was normal." After this incident, the couple's romantic relationship ended.

Although Tyson did not report the assault on the day that it occurred, she ultimately called the police. The police took Tyson's statement and photographed her bruises.

Davis frequently texted Tyson after these violent episodes and implored her not to give up on their relationship, but Tyson tried to make it clear to Davis that she no longer wanted to be with him. Eventually, Tyson agreed to meet Davis at Chase Bank for an exchange: she owed him money and he had her car keys. Tyson brought cash to pay Davis what she owed him, but he refused to hand over her car keys. Instead, he argued with her, threw her keys across the parking lot, broke her acrylic fingernail, bit her, and eventually forced her to leave with him.

3

After this incident, Tyson and Davis continued to see each other, but Tyson repeatedly expressed that she did not want to be in a romantic relationship with him anymore. However, Davis would not leave her alone and began sending her threatening messages and making uninvited visits to her apartment.

In November 2023, Tyson sent Davis a text message reiterating that she did not want to be with him. After receiving the message, Davis called her and yelled at her over the phone; he was upset, angry, and aggressive.

About fifteen minutes later, Davis arrived at Tyson's apartment. Tyson was outside in the common area of her apartment complex when Davis arrived. Davis quickly approached Tyson, put his arm around her, and tried to strangle her to the ground. He told her that she was never going to leave him. He then forced her to go upstairs to her apartment.

Once Tyson's door was shut, Davis hit her in the face with his fist, and she fell to the kitchen floor. He hit her multiple times, giving her a black eye, and then got on top of her and started strangling her. He continued to repeatedly strangle her, stopping when she started getting blue in the face and began to pass out and then resuming once she started breathing again.

Eventually, Davis got off of Tyson and took her tablet and phone. He then began grabbing some of Tyson's clothing, packed them in a bin, and told her that she would not be coming back to her apartment for a while. He made her shower and

4

change clothes. After Tyson got out of the shower, Davis pushed her to the ground and attempted to hit her with a chair.

Eventually, Davis grabbed a knife from the kitchen and stated, "We got to go." While wielding the knife, he told Tyson that he would hurt her if she ran. Davis then forced her to leave, and they walked out together. Tyson believed that Davis would stab her if she did not go with him.

Davis first drove Tyson to a daycare facility to pick up her daughter,[2] and then took the two of them to his house. Once they arrived at Davis's house, he purchased first-aid items for Tyson and acted as if everything was normal. While Tyson received treatment for her injuries, her daughter played and watched her tablet in a secondary bedroom. Eventually, Tyson was able to use her daughter's tablet to message someone for help.

When Davis saw the message, he began yelling at Tyson and physically assaulting her again. He strangled her, kicked her, and hit her in the head so hard that she heard a loud ringing sound. After this latest round of assaults, Tyson had two black eyes and could barely see.

---

[2]Because of Tyson's injuries, she remained in the car while Davis went inside the daycare facility to pick up her daughter. However, because Davis had taken her phone, she could not call for help while she was alone in the vehicle. She did not get out the car because she feared that Davis might harm her daughter or the other children at the daycare if he saw her try to escape.

After Davis "tr[ied] to heal" Tyson for several days at his house, he finally agreed to take her to the hospital. At Davis's direction, Tyson told the hospital staff that she had been "jumped" and beaten up by "some other people." After Tyson was admitted to the hospital, Davis stayed by her side the entire time so that she would not have the opportunity to tell anyone about what had actually happened. At one point when Davis left her hospital room, Tyson immediately told the nurse, "You have to get me out of here because he's going to hurt me." The hospital staff worked quickly to move Tyson to a secure unit.

When the nurse examined Tyson, she observed that she had a bite mark on her back and was bruised from head to toe, including her face, arms, chest, thighs, and buttocks. Because the bruises were in different stages of healing, she could tell that they were not all from a single incident.

Tyson's mother testified that when she visited her daughter in the hospital, Tyson's eyes were swollen shut and blackened. She also testified that Tyson had bruises all over her body, had severe spasms that prevented her from sleeping, could not walk, and needed assistance going to the bathroom and showering.

As a result of Davis's assaults, Tyson suffered a subdural hematoma as well as aneurysms of her carotid and left vertebral arteries. These injuries caused pressure and a lack of blood supply to her spinal cord and her cerebellum—the area of the brain that helps with spatial awareness. As a result, Tyson could not walk or stand unaided when she first arrived at the hospital, and she had to go to an inpatient rehabilitation

6

facility to learn how to walk again. Based on conversations with her medical professionals, Tyson's understanding is that her brain injury "might not ever go away."

Ultimately, Davis was indicted for Counts One through Five as set forth above. He pled guilty to Count Five and not guilty to the remaining counts. Following a jury trial, he was convicted of Counts One, Three, Four, and Five.[3] After a bench trial on punishment, the trial court affirmatively found that Davis had committed family violence as alleged in Count Three and that the indictment's repeat-offender enhancement was true and it recognized that the jury had found the deadly-weapon allegation in Count Four to be true. Based on those findings, the trial court sentenced Davis to life imprisonment on Counts One, Three, and Four and to twenty years' imprisonment on Count Five. This appeal followed.

## II. DISCUSSION

As noted, Davis raises three issues on appeal. We address each of these issues in turn below.

### A. Sufficient Evidence Supports the Deadly-Weapon Findings

In his first issue, Davis contends that the record contains insufficient evidence to support the jury's finding that he used his hands as a deadly weapon while

---

[3]*See supra* note 1.

assaulting Tyson as alleged in Counts One and Four and used or exhibited a knife as a deadly weapon while assaulting Tyson as alleged in Count Three. We disagree.

### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the challenged essential element beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017); *Stephenson v. State*, 673 S.W.3d 370, 384 (Tex. App.—Fort Worth 2023, pet. ref'd). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all

8

the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

To determine whether the State has met its burden to prove a defendant's guilt beyond a reasonable doubt, we compare the crime's elements as defined by a hypothetically correct jury charge to the evidence adduced at trial. *Hammack v. State*, 622 S.W.3d 910, 914 (Tex. Crim. App. 2021); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Hammack*, 622 S.W.3d at 914. The law as authorized by the indictment means the statutory elements of the offense as modified by the charging instrument's allegations. *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021); *see Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

### 2. Applicable Law Regarding Deadly Weapons

A deadly weapon is "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B).

"A deadly[-]weapon finding must be supported by evidence relating directly to the circumstances of the criminal episode." *Johnston v. State*, 115 S.W.3d 761, 764 (Tex. App.—Austin 2003), *aff'd*, 145 S.W.3d 215 (Tex. Crim. App. 2004). Thus, the Court of Criminal Appeals has identified a two-step process for analyzing an evidentiary-sufficiency challenge to a deadly-weapon finding. *See Glover v. State*, 710 S.W.3d 816, 820 (Tex. Crim. App. 2025) (citing *McCain v. State*, 22 S.W.3d 497, 502–03 (Tex. Crim. App. 2000)). Under this analytical framework, a reviewing court must first determine whether "the object . . . [could] be a deadly weapon under the facts of the case." *Id.* (quoting *McCain*, 22 S.W.3d at 502). "If that question is answered in the affirmative," then the court must "ascertain whether that object was used or exhibited during the offense." *Id.*

For an object to constitute a deadly weapon, the evidence must show that it had more than a hypothetical capability of causing death or serious bodily injury. *Johnston*, 115 S.W.3d at 764. Evidence that a factfinder may consider in determining whether an object was used as a deadly weapon includes the physical proximity between the victim and the object, any threats or words used by the defendant, the manner in which the defendant used the object, testimony by the victim that he or she feared death or serious bodily injury, and testimony that the object had the potential to cause death or serious bodily injury. *Hopper v. State*, 483 S.W.3d 235, 239 (Tex. App.—Fort Worth 2016, pet. ref'd).

10

A hand or foot may be a deadly weapon based on its manner of use or intended use and its capacity to produce death or serious bodily injury. *Id.* A person need not have intended to cause serious bodily injury or death—or to have actually caused serious bodily injury or death—for his hand or foot to constitute a deadly weapon. *Id.* But the injuries, if any, suffered by a victim are factors to be considered in determining whether a hand or a foot was used as a deadly weapon. *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004). As long as the totality of the evidence shows that the defendant's hand or foot was capable of causing serious bodily injury or death in the manner that he used it, the jury is authorized to find that his hand or foot qualified as a deadly weapon. *Hopper*, 483 S.W.3d at 239.

Similarly, a knife is not a deadly weapon per se. *See Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2009) (citing *McCain*, 22 S.W.3d at 502–03); *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991). "Instead, a knife becomes a deadly weapon if, in the manner of its use or intended use, it is capable of causing death or serious bodily injury." *Vinson v. State*, No. 02-09-00357-CR, 2010 WL 5395838, at *4 (Tex. App.—Fort Worth Dec. 30, 2010, pet. ref'd) (mem. op., not designated for publication) (citing *McCain*, 22 S.W.3d at 503). Factors to consider in determining whether a knife is intended to be used as a deadly weapon include its size, shape, and sharpness; the manner of its intended use; the nature or existence of inflicted wounds; evidence of its life-threatening capabilities; the physical proximity between the victim and the knife; and any words spoken by the one using the knife. *See Thomas*,

11

821 S.W.2d at 619–20; *Blain v. State*, 647 S.W.2d 293, 294 (Tex. Crim. App. 1983); *Bailey v. State*, 46 S.W.3d 487, 491 (Tex. App.—Corpus Christi–Edinburg 2001, pet. ref'd). No one factor is determinative, and each case must be examined on its own facts. *See Brown v. State*, 716 S.W.2d 939, 946–47 (Tex. Crim. App. 1986).

### 3. Analysis

The indictment alleged that Davis used his hands as a deadly weapon while committing Counts One and Four. And the State presented ample evidence to support a finding that Davis had used his hands in a manner capable of causing serious bodily injury or death during the commission of those offenses. *See id.* Tyson testified that Davis had repeatedly punched her in the head and had strangled her at least four times. The strangling was so severe that it nearly caused her to lose consciousness, and her neck was so bruised and swollen that she had difficulty talking even days afterward. As a result of these assaults, Tyson suffered a subdural hematoma as well as aneurysms of her carotid and left vertebral arteries and had go to an inpatient rehabilitation facility to relearn how to walk.

Considering this evidence in its totality and viewing it in the light most favorable to the verdict, we conclude that a factfinder could reasonably find that Davis used his hands in a manner capable of inflicting serious bodily injury or death while assaulting Tyson as alleged in Counts One and Four. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Lane*, 151 S.W.3d at 192 (holding that evidence was sufficient to support finding that appellant had used his hands and his foot as deadly weapons

12

because his assault had caused the victim to suffer "a concussion to the brain, bruising, and temporary loss of consciousness"); *Walker v. State*, No. 02-23-00196-CR, 2024 WL 3364823, at *9 (Tex. App.—Fort Worth July 11, 2024, no pet.) (mem. op., not designated for publication) (holding that the evidence was sufficient to support finding that appellant had used his hands as a deadly weapon because the victim had "suffered from a single-sided subdural hematoma, an arachnoid hemorrhage to his right side, optic-nerve hemorrhages, and retinal hemorrhages"); *Quincy v. State*, 304 S.W.3d 489, 500–01 (Tex. App.—Amarillo 2009, no pet.) (holding that evidence that appellant had grabbed the victim's throat, had caused her to fall by striking her on the head with a closed fist "with force sufficient to create a . . . gaping wound that split [her] scalp," and had punched her after she fell was sufficient to support finding that he had used his hands as a deadly weapon). Accordingly, we conclude that the evidence is sufficient to support the jury's deadly-weapon findings with regard to Counts One and Four. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

The indictment also alleged that Davis used or exhibited a knife as a deadly weapon while committing Count Three. To prove this allegation, the State offered Tyson's testimony that after hitting and strangling her at her apartment, Davis grabbed a knife; instructed her to leave with him; and—while wielding the knife—threatened to hurt her if she ran. Tyson further testified that she believed that Davis would stab her if she did not go with him.

Considering this evidence in its totality and viewing it in the light most favorable to the verdict, we conclude that a factfinder could reasonably find that Davis used or exhibited a knife in a manner capable of inflicting serious bodily injury or death while assaulting Tyson as alleged in Count Three. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also Billey v. State*, 895 S.W.2d 417, 422 (Tex. App—-Amarillo 1995, pet. ref'd) (explaining that evidence is sufficient to support a finding that an appellant used a knife as a deadly weapon if it shows that the knife was "displayed in a manner conveying an express or implied threat that serious bodily injury or death w[ould] be inflicted if the desire of the person displaying the knife [was] not satisfied" (citing *Jones v. State*, 843 S.W.2d 92, 96 (Tex. App.—Dallas 1992, pet. ref'd))); *cf. Brown v. State*, No. 09-10-00233-CR, 2011 WL 1204016, at *2 (Tex. App.—Beaumont Mar. 30, 2011) (mem. op., not designated for publication) (holding that evidence was sufficient to support finding that appellant had used a knife as a deadly weapon during a robbery even though the complainant had suffered no injuries and the knife was not introduced into evidence at trial because, among other things, the complainant had testified that the appellant had "displayed the knife in a manner that conveyed to [her] an express or implied threat that [he] would inflict serious bodily injury on her or kill her if his demands were not met"), *pet. stricken by*, No. PD-0738-11, 2011 WL 2582127 (Tex. Crim. App. June 29, 2011) (order). Accordingly, we conclude that the evidence is sufficient to support the jury's deadly-weapon finding with regard to Count Three. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789.

We overrule Davis's first issue.[4]

## B. Sufficient Evidence Supports the Serious-Bodily-Injury Finding

In his second issue, Davis contends that the record contains insufficient evidence to support the jury's finding that he caused serious bodily injury to Tyson as alleged in Count One. We disagree.

The Texas Penal Code defines "bodily injury" as "physical pain, illness, or any impairment of physical condition." Tex. Penal Code § 1.07(a)(8). "Serious bodily injury" is "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46). "[P]rotracted" means "continuing, dragged out, drawn out, elongated, extended, lengthened, lengthy, lingering, long, long-continued, long-drawn, never-ending, ongoing, prolix, prolonged, or unending." *Moore v. State*, 739 S.W.2d 347, 352 (Tex. Crim. App. 1987) (en banc). Because the

---

[4]Although this argument is not listed as a formal appellate issue in his brief, Davis argues in the alternative under his first issue that the Penal Code is unconstitutional to the extent that it allows a deadly-weapon finding based upon the mere exhibition—as opposed to the use—of a defendant's hands. But because Davis failed to include any record citations, authority, or cogent argument to support his alternative constitutional complaint, he has forfeited it due to inadequate briefing. *See Hopper*, 483 S.W.3d at 237; *see also* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011) (holding that appellant's point of error was "inadequately briefed and present[ed] nothing for review as [the court was] under no obligation to make appellant's arguments for her"); *Jessop v. State*, 368 S.W.3d 653, 681, 685 (Tex. App.—Austin 2012, no pet.) (holding that because appellant had failed to proffer any argument or authority with respect to his claims, he had waived any error due to inadequate briefing).

15

Legislature intended that there be a meaningful difference between "bodily injury" and "serious bodily injury," the determination that an injury qualifies as a serious bodily injury must be made on a case-by-case basis. *Id.* at 349.

As detailed above, the State presented evidence showing that Davis's repeated hitting and choking of Tyson caused her to suffer a subdural hematoma as well as aneurysms of her carotid and left vertebral arteries and that Tyson's cerebellum was damaged to the point that she had to go through rehabilitation to relearn how to walk. And Tyson testified that she has been told that her brain injury "might not ever go away."

Considering this evidence in its totality and viewing it in the light most favorable to the verdict, we conclude that a factfinder could reasonably find that Davis caused Tyson serious bodily injury. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *see also* Tex. Penal Code § 1.07(a)(46); *Comeaux v. State*, No. 11-10-00308-CR, 2012 WL 2045950, at *2 (Tex. App.—Eastland June 7, 2012, pet. ref'd) (mem. op., not designated for publication) (recognizing that choking creates a substantial risk of death and therefore constitutes a serious bodily injury because it "runs the risk" of compressing "several vital arteries and veins that run through the neck," "which could affect circulation of blood to the brain"); *Madden v. State*, 911 S.W.2d 236, 244–45 (Tex. App.—Waco 1995, pet. ref'd) (holding that victim's testimony that bullet wound in his hip had prevented him from walking for one month was sufficient to

16

prove that he had suffered a serious bodily injury in the form of the protracted impairment of a bodily member).

We overrule Davis's second issue.

## C. Davis Failed to Preserve His Confrontation Clause Complaint

In his third issue, Davis contends that his confrontation rights were violated during the trial's punishment phase when the trial court allowed a police officer to testify about another alleged assault committed by Davis based on the officer's interview with the alleged victim. [ANT 2–3, 14] But Davis failed to preserve this complaint for our review.

### 1. Applicable Law and Preservation Requirements

The Sixth Amendment's Confrontation Clause, applicable to the states through the Fourteenth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *Crawford v. Washington*, 541 U.S. 36, 38, 42, 124 S. Ct. 1354, 1357, 1359 (2004); *Langham v. State*, 305 S.W.3d 568, 575 (Tex. Crim. App. 2010) (citing U.S. Const. amend. VI). An appellant's complaint that he has been denied his rights under the Confrontation Clause is subject to the same preservation requirements as other appellate issues. *See Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010). Thus, to preserve a Confrontation Clause complaint for appellate review, a party must (1) make a timely objection or request to the trial court and (2) obtain an adverse ruling. *See* Tex. R. App. P. 33.1(a); *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002). By failing

17

to object and obtain an adverse ruling on a Confrontation Clause objection, a party forfeits that complaint on appeal. *See Gourley v. State*, 710 S.W.3d 368, 373, 375 (Tex. App.—Fort Worth 2025, pet. ref'd) (holding that appellant had not preserved her confrontation complaint because she had not raised it in the trial court); *see also Linney v. State*, 401 S.W.3d 764, 774 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding that appellant had failed to preserve error even though he had objected on Confrontation Clause grounds at trial because he had failed to obtain an adverse ruling on his objection).

### 2. Analysis

During the trial's punishment phase, the State called a police officer to testify about responding to a domestic-violence call concerning Davis and another alleged assault victim in March 2021. When the officer was asked to provide information about the call, Davis objected based on Article 37.07 of the Texas Code of Criminal Procedure and evidentiary Rules 404(a) and (b). *See* Tex. Code Crim. Proc. art. 37.07; Tex. R. Evid. 404(a), (b). The trial court overruled the objection and granted Davis a running objection. Later, when the State asked the officer to identify the person whom the alleged victim had named as her assailant, Davis raised a hearsay objection, which was overruled. *See* Tex. R. Evid. 802. The officer then testified as to what the victim had told him about her relationship with Davis and the alleged assault.

Thus, while Davis objected to the officer's testimony on various grounds, the Confrontation Clause was not among them. Accordingly, we hold that Davis has not

18

preserved his confrontation complaint because he did not raise it in the trial court. *See Gourley*, 710 S.W.3d at 375; *see also Bin Fang v. State*, 544 S.W.3d 923, 930 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding that appellant's "hearsay objections did not preserve error for his complaint on appeal concerning the Confrontation Clause"); *Mitchell v. State*, 238 S.W.3d 405, 409 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that appellant's hearsay objection did not preserve error on his confrontation complaint and stating that "[h]earsay objections and objections to violations of the constitutional right to confront witnesses are neither synonymous nor necessarily coextensive").

We overrule Davis's third issue.

### III. CONCLUSION

Having overruled all of Davis's issues, we affirm the trial court's judgments.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 18, 2026

19